Franklin WITTENBERG, Plaintiff,

v.

DEVON INDUSTRIES, INC., Arnold A. Fisher, the Toy Manufacturers of America, Inc. and The Charles Snitow Organization, Defendants.

No. 79 Civ. 729–CSH.

United States District Court,
S. D. New York.

Feb. 14, 1979.

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff; Stevan J. Bosses, New York City, of counsel.

Howard F. Cerny, Ernest F. Marmorek, New York City, for defendants Devon Industries Inc. and Arnold A. Fisher.

Locker & Greenberg, New York City, for defendant The Toy Manufacturers of America, Inc.; Christopher Corbett, New York City, of counsel.

Coudert Brothers, New York City, for defendant The Charles Snitow Organiza-

tion; Michael J. Calvey, New York City, of counsel.

## MEMORANDUM OPINION

HAIGHT, District Judge:

Plaintiff Franklin Wittenberg is an international marketer of commercial properties. By virtue of a licensing agreement, he acquired an interest in a voice controlled motorized toy van. Relying upon § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law trademark rights, plaintiff moves pursuant to Rule 65, F.R.Civ.P., for a preliminary injunction to restrain defendants Devon Industries, Inc. (Devon), Arnold A. Fisher, The Toy Manufacturers of America, Inc. (TMA) and The Charles Snitow Organization (Snitow) from certain contemplated actions with respect to a comparable toy.

The Court, having held an evidentiary hearing and considered the affidavits of record and arguments of counsel, enters the following Findings of Fact, Discussion, and Conclusion of Law. For the reasons stated below a preliminary injunction will issue against defendants Devon and Fisher, although in a form different from that for which plaintiff prayed. Injunctive relief against defendants TMA and Snitow is denied.

## FINDINGS OF FACT

In June of 1977 plaintiff Wittenberg, a commercial marketing entrepreneur, attended a trade show of electronic devices in Chicago. He there observed on display a voice controlled motorized toy van. The phrase "voice controlled" means that, as the result of electronic circuitry, the toy van is able to respond to its owner's spoken commands: "turn left"; "turn right"; "stop"; "back up." The van plaintiff observed at the 1977 Chicago show was named "George": that is to say, the name "George" was written in a distinctive script across the sides of the van and on the back doors; and the box in which the toy was packaged repeated the name "George" and displayed a picture of the van, together with a panel (on the bottom of the box) depicting two children watching the van respond to a series of spoken directions. A van and a box identical to those plaintiff observed at the 1977 Chicago show were admitted as PX 1 and 3 respectively at the hearing.

The concept of a toy that responds to voice commands (free of wires or other direct, umbilical dependencies) is new. In the months following the 1977 show plaintiff was aware of marketing efforts involving "George"—it was the subject of television commercials and an article in Business Week. Plaintiff regarded the van as a unique toy. He did not interest himself in the concept until, in late May or early June of 1978, he was approached by individuals associated with a California corporation, doing business in Waterbury, Conn., called Imaginetics International, Inc. (Imaginetics). In negotiations extending into August of 1978, plaintiff was advised, *inter alia*, that the voice controlled motorized toy van in question had been invented by one Robert McCaslin, who had patented the invention; that the invention had been identified with the name "George"; that in December, 1975 McCaslin had transferred his right, title and interest in the invention "George" to Imaginetics; and that Imaginetics was the registered owner of a United States trademark designated "George." These advices appear in the preliminary recitals to a licensing agreement executed on August 15, 1978 between Imaginetics and plaintiff (PX 2). The recitals also refer to other parties' complications and disputes not pertinent to resolution of the present motion, except to say that by reason of a joint venture agreement concluded in December, 1977 between Imaginetics and a California corporation called Altaire Industries, Inc., Altaire entered into a purchase agreement with Maker Industrial Co., Ltd. (Maker), a Hong Kong corporation, pursuant to which Maker was to manufacture "George" from a mold created by Maker and paid for by Imaginetics. The licensing agreement between Imaginetics and plaintiff purports to grant to plaintiff, for 17 years, exclusive worldwide rights under the

"George" patent and trademark, and all related rights and privileges relating to the "George Concept" (a phrase that reoccurs throughout the licensing agreement). Plaintiff is obligated to return a $1 royalty "on the sale to any person of each unit of product embodying the 'George Concept' . . . ." (PX 2 at ¶ 4a).

Prior to the execution of this licensing agreement with plaintiff, Imaginetics had made other efforts to produce and market "George." The toy was displayed at a number of industry shows. Exposure was obtained on television programs, in magazines (including "Business Week"), and newspapers. Considerable interest was forthcoming. Imaginetics received a substantial quantity of orders. An effort was made by the company to fill some of these orders, but the units produced by the first production runs were defective in performance, and the customers returned them. This led to the joint venture agreement with Altaire, which as noted *supra,* contemplated production of the toys by Maker in Hong Kong. No units had actually been produced by Maker at the time plaintiff entered into the licensing agreement of August 15, 1978, although plaintiff was shown a number of unfilled orders and inquiries, which influenced plaintiff to enter into the licensing agreement.

After entering into that agreement, plaintiff entered into a purchase contract with Maker, contemplating the manufacture and sale to plaintiff, by Maker, of 660,000 "George" units. Plaintiff received some 3,000 units under this order in early fall of 1978. He determined that they were defective, an evaluation that was confirmed when three leading retail stores (J. C. Penney, Sears, Roebuck, and Montgomery Ward) tested the toy at plaintiff's request and rejected it. Plaintiff has caused new engineering to be done, has cancelled the purchase contract with Maker in Hong Kong, and intends to produce "George" in the United States, with improved circuitry and performance control. Plaintiff has expended some $200,000 in pre-production costs for "George" to date. He plans to begin producing his technically improved version of "George" in spring of 1979.

Defendant Devon acquired its interest in this particular toy when, in a contract effective on January 19, 1979, Devon contracted to purchase a toy known as "Harry" from a company called Maker Industrial (Europe) Ltd., a United Kingdom corporation. Maker (Europe) is closely affiliated with Maker, Hong Kong. Pursuant to that agreement (DX B) Devon has been furnished with a toy named "Harry," made from the same mold as "George," and packaged in a box. The similarities between "George" and "Harry," as well as the similarities between their packagings, are referred to in further detail in the Discussion, *infra,* the factual recitations of which are adopted as a part of these Findings of Facts. I may summarize those findings by saying that there is a substantial likelihood of confusion of origin, arising out of the appearances of "George" and "Harry" and their respective packagings.

Devon has engaged in considerable advertising and marketing of "Harry," and intends to display "Harry" at the New York toy fair this month, having obtained a booth for that specific purpose. Shortly before filing of the complaint and application for injunctive relief in this case, plaintiff had learned of Devon's intentions. Plaintiff moved with reasonable dispatch for the relief sought by the present motion, which if granted would restrain Devon from any marketing or advertising of "Harry" in its present form, including the sale of vans made from the molds presently in the possession of Maker in Hong Kong.

Against this factual background, as expanded and clarified in the following "Discussion," the Court turns to the applicable law. I am constrained to note that neither counsel for plaintiff nor for defendants Devon and Fisher furnished the Court with timely memoranda of law. In that regard, plaintiff was in violation of General Rule 9(b) of this Court. The following discussion is based upon the Court's own research.

## DISCUSSION

Plaintiff's application for a preliminary injunction must be measured by the

familiar standards of *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 251 (2d Cir. 1973) and *Triebwasser v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976), which the Second Circuit recently applied in a trademark infringement context to require "a showing that there is a probability of success upon trial, together with proof of irreparable injury to plaintiff if the defendant is not enjoined." *American Home Products Corp. v. Johnson Chemical Co., Inc.*, 589 F.2d 103 at 106 (1978).

As to the merits, it is important at the outset to define plaintiff's theories of liability. Plaintiff does not claim infringement of patent rights; nor does he claim infringement of the registered "George" trademark. Counsel expressly disclaimed those theories during the hearing. Plaintiff proceeds upon the bases of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] and common law trademark rights.

■■ That being the case, plaintiff's effort to enjoin defendants Devon and Fisher from any use of a van manufactured from the presently existing molds must fail. Copying of an article is permissible unless it constitutes an infringement of patent, which is not claimed here; in the absence of an assertion of infringement all the law forbids is deception as to source. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). ". . . [T]he act of copying (even if there were proof of such) does not provide a basis for a charge of unfair competition." *American Rolex Watch Corp. v. Ricoh Time Corp.*, 491 F.2d 877, 879 (2d Cir. 1974), citing *Sears, supra*, and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

■ On the other hand, the particular use of the toy sought to be made by the defendants in all probability constitutes unfair competition, under Lanham Act and common law trademark standards. The original concept of Imaginetics, thereafter conveyed by license to plaintiff, was to give the van a familiar man's name; to place the name in distinctive lettering along the sides of the van; to surround the name by an equally distinctive "flame" pattern; to give the van a smiling face; and to package the van in a box containing drawings of children, playing with the toy, upon one of its panels. Defendants are marketing a van with an equally familiar (if different) man's name, inscribed in the same style lettering, surrounded by a highly similar "flame" pattern, sporting a smiling face, and encased in a box with an identical drawing. The only differences in the toy are that plaintiff's van is called "George" and painted yellow, while defendants' van is painted blue and called "Harry." Neither van, nor its box, gives any information as to the identity of the manufacturer, apart from the phrase on the underside of each van: "Made in Hong Kong." The likelihood of confusion as to source is apparent.[2]

---

1. The statute provides:

 "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

2. Compare *American Rolex Watch Corp., supra*, at 877, in which the Second Circuit observed that the prominent display of the defendant manufacturer's name upon its challenged watch was fatal to plaintiff's Lanham Act, § 43(a) claim of false designation of origin. No such display appears here. Customers could readily imagine that the same manufacturer put out two vans with different names for the sake of variety, or, in the eyes of children, companionship. One thinks of Tom and Jerry; Ernie and Bert; and other couples of childhood fancy.

It is apparent from the evidence that plaintiff and defendants will seek to advertise their vans in the same media and compete for the same markets. Thus the potential for confusion is a real one; and, even accepting (as I do on this motion) that the present defendants have not themselves practiced fraud, "the fact of their good faith cannot eliminate the likelihood of consumer confusion." *Avon Shoe Co. v. David Crystal, Inc.*, 279 F.2d 607, 612 (2d Cir. 1960).

 The Lanham Act and state common law standards of unfair competition are essentially the same. *R.D. Communications, Inc. v. Dial Media, Inc.*, 429 F.Supp. 1011, 1014 n. 4 (S.D.N.Y.1977). Plaintiff may assert both theories in this Court. *Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801 (2d Cir. 1973). Plaintiff has demonstrated the requisite likelihood of success under either theory. As to common law trademark, a man's name, in a distinctive script and surrounded by the flame design, combine to form a marking sufficiently arbitrary and fanciful to qualify for protection. Cf. *McCormick & Co. v. B. Manischewitz Co.*, 206 F.2d 744 (6th Cir.). In *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974), the Second Circuit said generally of common law trademark rights:

> "Under familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark, (citing cases)."

These factors are present in the case at bar. Imaginetics, plaintiff's licensor, appropriated the mark not later than 1977, when plaintiff first observed "George" at the Chicago toy show. That is prior to defendants'

use. While Imaginetics' initial efforts at marketing the van were not successful, the license agreement upon which plaintiff sues and his own marketing preparations demonstrate "an intention to continue exploiting the mark commercially." This is not a case where plaintiff's use was "purely defensive" and designed only to deprive others, *La Societe Anonyme, supra,* at 1275; or where plaintiff's use was isolated and its complaint about defendant's use so belated as to constitute laches, *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 535 (2d Cir. 1964).

To the extent that secondary meaning is pertinent, Imaginetics' advertising and marketing efforts, as revealed by the evidence, furnish a sufficient basis for inference of secondary meaning to satisfy the requisite showing of probable success upon the trial. I attach significance, in that regard, to the fact, apparently agreed by the parties, that this is the first voice activated toy vehicle ever developed. It was therefore a distinct innovation, and, the evidence shows, excited widespread interest whenever displayed.[3] As a matter of common sense, where the product is innovative and attracts immediate interest, a lesser degree of usage is required to establish a secondary meaning identifying its source than if the product were, say, just another corset.[4]

 Viewing the two vans side by side, it is clear that "Harry" mimics "George" to such a degree that plaintiff is probably entitled to protection. *Venetianaire Corp. of America v. A & P Import Co.*, 429 F.2d 1079, 1082 (2d Cir. 1970). Expanding the focus to include plaintiff's trade dress claim, either as a form of unfair competition or as a "false designation" within the meaning of § 43(a) of the Lanham Act, "the issue is whether similarities in packaging create a probability of confusion as to source of origin." *Combe, Inc. v. Scholl, Inc.*, 453 F.Supp. 961, 963 (S.D.N.Y.1978). Plaintiff is entitled to relief "if the total

---

**3.** Imaginetics' initial displays in 1977 prompted many orders. Devon's recent efforts, according to Fisher, have produced orders for 40,000 units.

**4.** This is not to say that I regard the "George"-flame design trademark as being so weak that it requires secondary meaning for its validity.

impression of package, size, shape, color, design and name upon the consumer will lead him to confuse the origin of the product." *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863 (S.D.N.Y. 1962), *aff'd*, 312 F.2d 125 (2d Cir. 1963). The total impression created in the case at bar contains within it a sufficiently high probability of confusion to entitle plaintiff to relief.

■ Plaintiff has also demonstrated a sufficient likelihood of irreparable injury if defendants are not enjoined from marketing "Harry" in its present form and packaging. Because of the confusion as to origin, plaintiff's business reputation and good will are placed in jeopardy due to his inability to exercise any control over the nature and quality of the goods being advertised or sold by defendants. That is a factor militating in favor of injunctive relief under the law of this Circuit, *Standard Brands v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945), and may be considered on a motion for a preliminary injunction, *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F.Supp. 429, 437 (W.D.N.Y.1978).[5] The difficulty plaintiff would encounter in calculating the precise measure of its damages should defendants obtain an unfair market advantage, and the uncertainty of adequate compensation to plaintiff, also incline the Court to a preliminary injunction. *Miller Brewing Co., supra*, and cases cited at 438.

■ While defendants challenged the standing of plaintiff to complain of their actions, it is clear that plaintiff, as exclusive licensee from Imaginetics, and in direct competition with defendants in the same market and in respect of vans produced from the same molds, is a person who "is or is likely to be damaged," 15 U.S.C. § 1125(a), and hence has standing. *National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. 733, 746 (S.D.N.Y. 1974).

■ In contrast to defendants Devon and Fisher, no basis exists for injunctive relief against defendants TMA and Snitow. They are the organizer and manager, respectively, of the toy fair, at which "more than 400 exhibitions will display some 150,-000 separate items."[6] Neither of these defendants has anything to do with the selection or approval of any item to be displayed. I decline to constitute either of these defendants as enforcers of the other defendants' obligations under the injunction, thereby placing TMA and Snitow at risk in the event of non-compliance.

For the reasons stated *supra*, the form of the injunction will not be as broad as that requested by plaintiff. Specifically, it will not enjoin defendants from marketing vans made from the Hong Kong molds. The injunction being entered herewith is fashioned to eliminate that confusion in origin which underlies plaintiff's substantive rights.

■ The question of security remains. The injunction will undoubtedly prevent defendants from exhibiting the toy at the New York fair in its present form and packaging. If defendants cannot bring the van into conformity with the injunction (by removing the lettering and design logos at issue), they will be prevented from any display of the van at the fair.[7] Fisher testified that Devon had expended between $50,000 and $60,000 in preparation for the fair, at which he only intends to display "Harry." Fisher also testified that, on the

---

5. In the case at bar, the quality of the product is of obvious concern. Plaintiff is skeptical of the Hong Kong manufacturer's abilities; he testified that the first samples produced by that source failed to meet his own standards, and were rejected by a number of leading stores. Plaintiff says he has made improvements and will manufacture "George" in the United States. Defendant Fisher testified that, whatever the earlier problems may have been, Hong Kong is now producing vans of excellent quali-

ty. I intimate no view on these questions, except to note that the issue of quality control is a real one.

6. Affidavit of Aaron Locker, counsel to TMA, dated February 13, 1979, at ¶ 5.

7. Presumably defendants will give some consideration to proceeding in that manner. The fair exists primarily to solicit orders from the trade, not to make over-the-counter sales.

basis of the advertising and marketing done by Devon to date, the company had in hand purchase orders for 40,000 units of "Harry" in its present form. Fisher testified further that, if he could not show the van at this fair, his credibility with distributors would be adversely affected; and that he would lose between $500,000 and $600,000 in net profits on prospective sales.

I disregard that latter figure, since under the Court's order Devon will not be restrained from marketing vans made from the Hong Kong mold. I am not persuaded that Devon would lose sales of that magnitude as the result of an inability to participate in this particular fair. As to the expenses claimed in preparation for the fair, it became apparent on cross-examination that to a certain degree the expenses were incurred in the investigation of the marketability of the product. Thus Fisher included in this total his expenses of flying to Hong Kong to examine the product, and thereafter to a toy fair in Nuremberg, Germany, where the vans were being displayed. These expenses relate more closely to long-term marketing of the van itself, from which defendants are not enjoined. Secondly, Devon will undoubtedly be able to use certain television commercials and brochures which they have prepared, the cost of which is also included in this total, if they ultimately prevail on the merits. It must be recognized, however, that certain expenses were undoubtedly incurred in connection with the New York fair which cannot be recaptured elsewhere; the 40,000 unit purchase orders presently on Devon's books, for "Harry" in its present form, may well be lost; and the Court cannot exclude the possibility that Devon may be able to prove further lost profits if the injunction makes it impossible for Devon to display the van and solicit orders at the fair. It is clear from the evidence that the fair is an important event; the toy is a potential moneymaker; the amounts at stake are large; and that plaintiff himself is an entrepreneur of considerable substance.[8] In these circumstances, issuance of the injunction will be conditioned upon the posting by the plaintiff of security in the amount of $100,000.[9]

## CONCLUSION OF LAW

Plaintiff has made the requisite showing for a preliminary injunction. An injunction

8. Plaintiff testified that he had expended over $200,000 in preparation for marketing "George"; that he had initially ordered 660,000 units from Hong Kong at a cost of $6.70 each, F.O.B. Hong Kong; and that, in a prior venture, he had invested over $2 million in preparing a miniature calculator concept for marketing.

9. While the issue of security necessarily leads to consideration of the damages defendants would suffer if the injunction was improvidently granted, I do not reach the "balancing of hardships" test under the second prong of *Sonesta, supra*, because I conclude that plaintiff is entitled to relief under the first *Sonesta* test and the authorities cited *supra* in the trademark and unfair competition fields.

The injunction requires plaintiff to post security not later than the close of business on Friday, February 16, 1979. That is because, according to the evidence, the toy fair will swing into full operation on Sunday, February 18; it is on that date that Devon intends to have its booth fully supplied with models of "Harry" in its present form and packaging. It would pose grave commercial risk for Devon to start the show with these displays, and then have plaintiff post security during the course of the show, so that Devon would be obliged to dismantle a booth and display which had attracted initial attention. Awkward inquiries from consumers would undoubtedly result. In these particular circumstances, and in the exercise of my discretion, I have directed that if plaintiff is to obtain an order restraining defendants from their intended activities at this particular toy fair, security must be posted not later than Friday, February 16. Should plaintiff fail to post such security by that time, defendants will not be restrained from displaying "Harry" at the fair. Questions of security that might arise, should plaintiff fail to make such security but apply for an injunction at a later date, will be considered if and when such application is made.

I have rejected plaintiff's draft injunction, insofar as it is drawn in general terms seeking to enjoin confusing or unfair conduct, or incorporates by reference the exhibits attached to the complaint. Rule 65(d) requires that the injunction "be specific in terms", and that it not refer, in respect of the conduct restrained, "to the complaint or other document." See, generally 7 *Moore's Federal Practice* ¶ 65.11 at pp. 65–101–109 (2d ed., 1978).

drawn in conformity with this opinion is being entered concurrently herewith.