**COMMERCE FOODS, INC., Plaintiff,**

v.

**PLC COMMERCE CORPORATION, Pan Ander Corporation, Robert G. Anderson and Ming-Fang Pan, Defendants.**

**No. 80 Civ. 4340 (CBM).**

United States District Court,
S. D. New York.

Oct. 24, 1980.

---

**192**

Pennie & Edmonds by David Weild, III, Rory J. Radding, Robert M. Kunstadt, New York City, for plaintiff.

Auslander, Thomas & Morrison by M. Arthur Auslander, New York City, Mattern, Ware, Davis & Stoltz by Robert H. Ware, Melvin I. Stoltz, Alfred A. Fressola, F. Eugene Davis, IV, Bridgeport, Conn., for defendants.

*Memorandum Opinion*

MOTLEY, District Judge.

Plaintiff Commerce Foods, Inc. (Commerce) brought this action against PLC Commerce Corporation (PLC), Pan Ander Corporation, Robert G. Anderson and Ming-Fang Pan, for false designation under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for unfair competition under §§ 133 and 368 of the New York General Business Law, and for infringement of Commerce's common law trademark rights. Commerce has moved for a preliminary injunction enjoining defendants from importing, promoting, distributing or selling fruit and mint flavored hard candies in round tins bearing a design that is similar to the "family line design" employed by Commerce on its fruit and mint candy tins. Commerce also seeks to enjoin defendants from using display racks and display boxes similar to those used by Commerce and from using the word "commerce" in PLC's corporate name. The court, having held a hearing, received exhibits and considered the affidavits of record and arguments of counsel, grants Commerce's motion for preliminary injunction.

*Facts*

Commerce has been an importer and distributor of fine foods and confections since 1951. Its business of concern in this action is the importation and distribution of flavored candy drops manufactured by La Vosgienne Confiserie of St. Quentin, France, which are pre-packaged in small round tins. Defendant PLC imports flavored candy drops in small round tins from Taiwan Morinaga Co., Ltd., of Taipei, Taiwan. Defendant Pan Ander Corporation purchases the candy drops from PLC for distribution in the United States. Defendant Pan is the president of Pan Ander and vice president of PLC, and defendant Anderson is the vice president of Pan Ander.

Commerce began to import and distribute hard candies from La Vosgienne Confiserie in 1961. Commerce has been the exclusive importer and distributor of these candies since that time. It introduced the use of a pop-up display box and open wire display rack with header for the promotion and sale of its candy tins in 1964. In 1969, La Vosgienne, at the suggestion of Commerce, redesigned the tins for its fruit and mint flavored candies to create what Commerce calls its "family line design." The new design borrowed elements from La Vosgienne's Pastillenes tins, the best recognized and best seller of the entire line of candies, which displayed a portrayal of fruit against a white background and had a gold border rim. The family design comprises the following elements: a prominent portrayal of a fruit or mint against a white background; a gold ring border; the name of the fruit displayed in French in black script lettering; the words "De La Vosgienne" in gold upper case block lettering; the name and address of La Vosgienne; the English name of the product in black upper case lettering; and a repeated portrayal of the fruit and an ingredients statement along the rim of the tin cover. Commerce also redesigned its display rack and placed a newly designed header in its lower portion in 1972.

In 1976, PLC was formed and began importing and distributing in the United States candy drops manufactured by Taiwan Confectionary Co., Ltd., labeled as "PLC Fruit Candy." Taiwan Confectionary Co. began manufacturing these candies in 1973 as a licensee of Morinaga & Co., Ltd. of Japan which had been selling the candy in the United States since 1970 under the label "Morinaga Lips Candy." Defendants submitted an affidavit of Ming-Fang Pan at the argument which stated that Morinaga & Co., Ltd. also sold identical Lips candy tins in Japan beginning in July, 1966, three years before Commerce introduced its fami-

ly design. These candies were all sold in tins similar in size and shape to the tins sold by Commerce and the tins were displayed in pop-up boxes.

In 1977, PLC redesigned its candy tins to display the "Ferrara" private brand name, and in about March, 1978, began selling tins to Ferrara Foods and Confections, Inc. for distribution by Ferrara in the United States. Also, in 1977, PLC began using a display rack with header in the lower portion similar to the one redesigned by Commerce.

Finally, in April, 1979, PLC began distributing candy tins which substituted PLC's own "Travelling" trademark for the Ferrara trademark. It is the Travelling Fruit Bonbons' tin design that Commerce claims is confusingly similar to its family line design. Like Commerce's fruit and mint candy tins, the Travelling tins bear a prominent portrayal of fruit against a white background, the name of the fruit in script lettering in the French language, the name of the fruit in gold upper case lettering in the English language, a gold border ring, and the repeated portrayal of fruit and an ingredients statement on the rim. The country of origin (Taiwan) and the name of the distributor are printed on the rim.

*Discussion*

The standard for granting a preliminary injunction is well-settled in the Second Circuit. The party seeking this relief must show both irreparable injury and either 1) a likelihood of success on the merits or 2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Selchow & Righter Co. v. McGraw Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978).

1. Merits

The touchstone of both false designation of origin under the Lanham Act and unfair competition under New York law is the likelihood that prospective purchasers will be misled or confused by the defendant's use of the trademark or trade dress in question. To succeed with its Lanham Act claim, the plaintiff must prove that the mark has acquired secondary meaning, or "that the design is a mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source." *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 697 (2d Cir. 1961). Under New York law, however, an injunction may issue against confusingly similar trade dress, even if no secondary meaning is shown. " . . . New York law has concerned itself principally with whether or not the public is likely to be confused, rather than with whether the first comer's trade dress has acquired secondary meaning." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980). New York law imposes on the second comer "a duty to do so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960). To warrant protection the first comer's design "need merely be distinctive enough to become recognized as 'a public guaranty of origin and quality.'" *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 258 (2d Cir.), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962).

In determining whether the second comer's trademark or trade dress has created sufficient likelihood of confusion to warrant a preliminary injunction, courts have considered: 1) the strength of the senior manufacturer's mark; 2) any showing of actual confusion; 3) the competitive proximity of the products; 4) the newcomer's purpose in adopting its mark; 5) the degree of similarity between the two marks; 6) the degree of similarity between the products; and 7) the degree of care likely to be exercised by consumers. *Menley & James Laboratories, Ltd. v. Approved Pharmaceutical Corp.*, 438 F.Supp. 1061, 1066 (N.D.N.Y.1977); *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 543 (2d Cir. 1956), *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82

S.Ct. 36, 7 L.Ed.2d 25 (1961); *McGregor-Do-niger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979). Taking these factors into account, this court finds that Commerce has demonstrated a probability of ultimate success on the merits of its claim under New York law of unfair competition.

### a) Strength of the Design

A crucial element this court must consider in assessing the likelihood of confusion is the strength of the La Vosgienne family design. The Court of Appeals for the Second Circuit recently defined the term "strength" as applied to trademarks in *McGregor-Doniger Inc. v. Drizzle Inc.,* supra at 1131, as "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." As stated above, to establish secondary meaning, Commerce must prove that its design is associated in the minds of the public with La Vosgienne Confiserie or Commerce rather than merely an anonymous source.

Commerce contends that its extensive advertising, marketing and distribution of La Vosgienne fruit and mint flavored candies in the family design since 1969 is a sufficient basis for inferring secondary meaning to satisfy the requisite showing of probable success on the merits. La Vosgienne hard candies in the family design are widely distributed throughout the United States. There are approximately 232 distributors and wholesalers of La Vosgienne candies who each service an average of 100 retail outlets, including department stores, specialty food chains, supermarkets and drug stores. Since introduction of the family design, Commerce's sales rose from 1.26 million tins in 1969 to 3.34 million in 1979, totalling sales of over 26 million tins of candy and $7 million over the ten year period. Seventy-five percent of these sales are attributable to sales of fruit and mint candies. Commerce has spent $800,000 on advertising since 1969, consisting almost entirely of magazine advertisements and fliers displaying tins with the family design.

While advertising and sales figures may be evidence of secondary meaning, they are relevant only to the extent that they create or reflect an identification in the mind of the consuming public of the trade dress with the manufacturer or distributor. *Remco Industries, Inc. v. Toyomenka, Inc.,* 286 F.Supp. 948, 953 (S.D.N.Y.), *affirmed per curiam,* 397 F.2d 977 (2d Cir. 1968). The fact that La Vosgienne fruit and mint candies are popular with the public does not necessarily mean that the public associates the family design with La Vosgienne Confiserie or with Commerce. Commerce has not offered any surveys or polls of consumers or evidence other than sales figures indicating such identification.[1] While it is not necessary, under the holding of *Maternally Yours v. Your Maternity Shop, supra* at 542, that plaintiff present evidence of actual instances of confusion in order for the court to grant relief, evidence of consumer opinion is useful in assessing the strength of a mark.

Defendants have offered exhibits of pocket size round candy tins sold in the United States by a number of distributors other than the parties which incorporate elements included in the La Vosgienne family design. Morinaga Lips Candy and Ferrara Fruit Bonbons, for example, continue to be sold in the United States. Defendants contend that the existence of these tins is evidence that the La Vosgienne family design has not been in exclusive use on La Vosgienne candy tins and raises a high obstacle to the creation of secondary meaning and the likelihood of confusion.

Commerce claims in response that until the introduction of Travelling Fruit Bonbons in 1979, there were only two direct competitors of La Vosgienne hard candies who sold their products in the same channels of trade as Commerce—Tissot of

---

1. Commerce submitted several exhibits of advertisements of La Vosgienne cherry flavored candy which appeared in Telefood Magazine and Specialty Foods Merchandising Magazine in January, February and March, 1980. It appears unlikely, however, that these magazines are read by the general consuming public.

France from 1965 to 1974, and Terassa of France from 1975 to the present. Defendants failed to offer any evidence regarding the extent of distribution of the other candy tins. Since there is no evidence that the tins presented by defendants are in direct competition with La Vosgienne candies, their mere existence is not evidence that the family design was a weak one.

Moreover, Commerce claims that the overall impression created by the design of the tins sold by Tissot and Terassa is different from that created by the La Vosgienne family design, and does not confuse the purchasing public. The Tissot and Terassa design consists of the photographic display of fruit occupying 100% of the tin cover. There is no script or gold lettering or gold border ring, and the ingredients statement appears on the cover rather than on the rim. The collocation of colors and lettering is completely dissimilar to that of La Vosgienne's family design.

■ In summary, the court finds that Commerce has shown that it is probable that, through its consistent use of the La Vosgienne family line from 1969 to 1979 without any significant competition and through its widespread distribution and sales of its fruit and mint candies, the public recognizes the family design as a distinctive guaranty of origin and quality. The court also finds, however, that Commerce has not offered sufficient evidence of public identification of the design with La Vosgienne or Commerce to prove the probable success on the merits of its Lanham Act claim.

### b) Deliberate Copying

Commerce alleges that PLC deliberately copied its family design through a calculated progressive (element by element) encroachment which began with the redesign of the Morinaga Lips Candy tin by PLC when it was created in 1976 and culminated with the introduction of Travelling Fruit Bonbons in 1979. The Morinaga Lips Candy introduced in the United States by Morinaga & Co. in 1970 incorporates only three elements contained in the La Vosgienne

family design—the portrayal of fruit against a white background, the border ring (but not in gold), and an ingredients statement on the rim. Coincident with the creation of PLC in 1976 was the redesign of the Morinaga Lips tins into a PLC Fruit Candy tin whose lettering and portrayal of fruit or mint more closely resembled that of the La Vosgienne family design. The PLC Fruit Candy tins also added a gold border ring and a repeated portrayal of fruit on the lid. The country of origin (Taiwan) and the name of the distributor were printed on the cover.

In 1978, PLC again redesigned its tins for distribution by Ferrara Foods and Confections, Inc. so that they bore an even closer resemblance to the La Vosgienne tins. The new tin cover no longer contained any reference to Taiwan. Instead, there appeared a prominent portrayal of the name of the fruit in black script lettering in the French language and the English name of the fruit in gold upper case lettering, similar in placement, design and coloring to the De La Vosgienne mark appearing on the La Vosgienne tin cover. Defendants claim that the name of the fruit is identified in both French and English on the Ferrara and Travelling tins to meet the requirements of Canadian law. However, they have not explained why it is necessary to include French language on tins sold in the United States or why the chosen lettering is so similar to that which appears on the La Vosgienne tins. The encroachment fully developed in 1980 when Travelling Fruit Bonbons, which substituted the trademark "Travelling" for "Ferrara," were introduced in the same channels of trade and at about the same retail price as the La Vosgienne hard candies.

■ This Circuit looks sternly on deliberate attempts by a junior user to "cash in" on the reputation, good will and market position of the senior user by copying the senior's trademark or trade dress. "In assessing the likelihood of confusion to the public, an important factor is whether or not the second comer created the similar trade dress intentionally. If there was in-

tentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded." *Perfect Fit Industries, Inc. v. Acme Quilting Co., supra* at 954. The cumulative absence of differentiation in the marks or dress of the parties has been viewed as evidence of conscious imitation. *See, e. g., Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., supra* at 759. Thus, the evidence that PLC gradually adopted elements of the La Vosgienne family design lends strong support to Commerce's claim that it is likely that consumers will confuse the tins.

### c) Degree of Similarity

■ It is not necessary that the parties' tins be identical in order for this court to find that they are confusingly similar. While there are some differences between the designs of the Travelling Fruit Bonbons and the La Vosgienne tins, this court must consider the overall impression created by the design of each tin. It is the "combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public." *Perfect Fit Industries, Inc. v. Acme Quilting Co., supra* at 955, *quoting Pharmaceuticals, Inc. v. United Whelan Corp.*, 22 Misc.2d 532, 534–35, 197 N.Y.S.2d 22, 25 (Sup.Ct.1959). Looking at the design of the tins as a whole, the design adopted by PLC for its Travelling Fruit Bonbons is strikingly similar to La Vosgienne's family design. It must be remembered that these products are generally bought on an impulse as the purchaser leaves the drug store or supermarket, with only a quick glance at the package. The consumer is moved to purchase the tin by the overall impression created by the design, without a careful inspection that would uncover differences in detail.

■ PLC argues that the display of the parties' respective trademarks "De La Vosgienne" and "Travelling" on the cover of the tins eliminates any confusion that would otherwise result from the similarity of the tin designs. This is true in many cases, and plaintiff must then offer evidence to overcome the apparent presumption that confusion will not arise because such labeling exists. *See, e. g., Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979). In this case, however, the labeling is not so significant and does not refute Commerce's evidence of likelihood of confusion. It is unlikely that the trademarks "De La Vosgienne" and "Travelling" stand out enough to the average consumer to distinguish the source of the products. PLC uses gold upper case lettering to print the name of the fruit bonbons which is almost identical in placement, design and coloring to the De La Vosgienne mark that appears on the La Vosgienne tin cover. PLC's trademark Travelling may appear to consumers as the name of a secondary brand of La Vosgienne candy. Furthermore, since consumers are used to recognizing La Vosgienne candies by the design, it is unlikely that they will check to see if the La Vosgienne trademark is actually printed on the tin cover.

### 2. Injury

■ This court also finds that Commerce will suffer irreparable injury *pendente lite* if defendants are not enjoined from selling candy in tins that are confusingly similar to those distributed by Commerce. Defendants point to the fact that Commerce has not offered any evidence of actual loss of sales even though Travelling Fruit Bonbons have been on the market since April 1979 and PLC and Ferrara candies have been sold in the United States in similar tins for several years. Proof of actual loss of sales, however, is not necessary to establish irreparable injury. Commerce alleges that its business reputation and good will will be damaged because of the confusion as to origin and because of its inability to control the quality of candy sold by PLC and to maintain the distinctiveness of its family design. Courts have held that the likelihood of such harm is a sufficient basis for injunctive relief. *See Wittenberg v. Devon Industries, Inc.*, 466 F.Supp. 681, 687 (S.D.N.Y.1979); *Menley & James Lab-*

oratories, Ltd. v. Approved Pharmaceutical Corp., supra at 1068.

*Conclusion*

Commerce has demonstrated the requisite probability that defendants, in marketing their fruit and mint candies, have engaged in unfair competition under the laws of New York. It has also shown that it will suffer irreparable injury to its reputation and good will and to the distinctiveness of its family design if defendants are allowed to continue this infringement. Therefore, a preliminary injunction will issue prohibiting defendants from importing, promoting, distributing or selling fruit and mint flavored candies in round tins with designs that are confusingly similar to the La Vosgienne family design. Defendants are also enjoined from importing, distributing, advertising or selling in connection with its display of these tins, display racks with headers and pop-up display boxes that are similar to those used by Commerce since they add to the likelihood that consumers will confuse the tins. For the same reason, defendants are enjoined as well from employing in packaging and promotion the word "commerce" in PLC's corporate name.

Submit order.

SO ORDERED.