P.F. COSMETIQUE, S.A. and Clairol Incorporated, Plaintiffs,

v.

MINNETONKA INC. and Excelsior Bay Company, Defendants.

No. 84 Civ. 5602 (PKL).

United States District Court, S.D. New York.

Jan. 29, 1985.

Rogers, Hoge & Hills, New York City (William F. Weigel, Lile H. Deinard, New York City, of counsel), for plaintiffs P.F. Cosmetique, S.A. and Clairol, Inc.

Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn. (Alan G. Carlson, Minneapolis, Minn., of counsel) and Nims, Howes, Collison & Isner, New York City (Thomas Kain, New York City, of counsel), for defendants Minnetonka, Inc. and Excelsior Bay Co.

LEISURE, District Judge.

This is an action for trade dress infringement. The plaintiffs, P.F. Cosmetique, S.A. ("Cosmetique") and Clairol, Inc. ("Clairol"), allege that the packaging of a line of beauty aids manufactured and sold by the defendants, Minnetonka, Inc., and its subsidiary, Excelsior Bay Co. (together "Minnetonka"), is confusingly similar to the packaging of one of plaintiffs' lines of beauty aids. Plaintiffs have sued under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] common law unfair competition and trademark infringement, the New York "anti-dilution" statute, N.Y.Gen. Bus.L. § 368–d[2] and the recently enacted New York Arts and Cultural Affairs Law, 7A 1983 Session L. News of N.Y. Ch. 876, Title K, Art. 33 (McKinney's 1983).[3] This case is now before me on plaintiff's motion for an order preliminarily enjoining defend-

ants from further use of the allegedly infringing packaging and directing that they recall all such packages currently in the marketplace. For the reasons set forth in this opinion, that motion must be denied.

## I. FACTS.

Sometime between the end of World War II and 1965 a line of shampoos and hair conditioners was created and marketed in France under the name "KLORANE." The Klorane products were made from plant and natural extracts and sold through pharmacies. Cosmetique acquired rights to the Klorane line in 1965, and commencing in 1970 began marketing Klorane in other European countries. By 1980, the Klorane hair care products were being sold in Switzerland, Spain, Belgium, Italy, Great Britain, Portugal and Greece. It was sold in Canada as well.

Cosmetique introduced Klorane into the American market in 1980. It hoped to carve out a distinct niche in the hair care market consisting of sophisticated consumers who seek high quality European-style natural hair care products. In this initial penetration of the American market, Klorane was sold to a limited number of upscale drug stores and department stores.

Clairol obtained the right to distribute Klorane in the United States in March

---

**1.** § 43(a) provides in pertinent part as follows.

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

**2.** § 368–d provides that:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of

unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

**3.** The relevant portions of the statute read as follows.

§ 33.09. Offenses against trade-marks. A person who:

....

5. Makes or sells, or offers to sell or dispose of, or has in his possession with intent to sell or dispose of, an article of merchandise with such a trade-mark or label as to appear to indicate the quantity, quality, character, place of manufacture or production, or persons manufacturing, packing, bottling, boxing or producing the article, but not indicating it truly; ...

8. ... is guilty of a misdemeanor.

7A 1983 Session L. News of N.Y. Ch. 876, Title K, Art. 33, § 33.09 (McKinney's 1983).

1982. The packaging of Klorane was allegedly a major reason for Clairol's interest in Klorane.[4] Indeed, except for slight alteration—Clairol added the Klorane name in bold capital letters at the top of the packages—the package is the same now as it was when Cosmetique was marketing it.

Clairol began test marketing Klorane in the spring of 1982 in eleven western states. The results were sufficiently positive that Clairol decided to begin nationwide distribution. Although it no longer limited distribution of Klorane to upscale drug and department stores, Clairol in its nationwide sales effort still limited distribution of Klorane to approximately one-third of its usual number of outlets, in order to maintain a prestigious, exclusive image for the product. Clairol has proclaimed Klorane a success; sales of Klorane last year exceeded six million dollars at wholesale.

Clairol attributes much of Klorane's success to its packaging, which apparently conveys a scientific, clinical, upscale, prestigious European look. Those Klorane products which derive from plants feature a picture of the source plant on the package. Those with nonbotanical bases have no picture. Although the packages for botanically-based products look different from those with a nonbotanical base, both attempt to convey the same clinical image. Promotions for Klorane have been entirely visual, concentrated in fashion magazines, department store mailings and in-store displays. Radio is not used.

In the summer of 1984 the New York Bath and Linen show was held. Among the exhibitors was Minnetonka, which was displaying mock-ups of its new "INSTITUTE SWISS" line, which was to be introduced that fall. The Institute Swiss line comprises a number of hair and beauty treatments including shampoos, conditioners, soaps and bath additives. A Clairol representative who attended the show noticed the Institute Swiss display and in-formed the Minnetonka personnel at the show that the Institute Swiss package featured in Minnetonka's displays and brochures was visually very similar to Klorane's package.

Plaintiffs brought suit in August 1984. At that time, distribution of Institute Swiss had not yet begun. In early November, however, plaintiffs discovered that Institute Swiss had in fact reached the market and in at least one store was being sold side-by-side with Klorane. This motion for a preliminary injunction followed.

## II. DISCUSSION.

### A. *Preliminary Injunction Standards.*

■ It is well-settled in this Circuit that a plaintiff who seeks a preliminary injunction must meet certain defined requirements. A preliminary injunction may be granted only upon a showing by the movant of

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (citations omitted); *accord Coca-Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982); *Standard & Poor's Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 707 (2d Cir.1982). A preliminary injunction is an extraordinary remedy and should not be granted routinely. It is reserved for cases in which need for it is manifest.

■ The Second Circuit recently stated that in § 43(a) and related unfair competition cases, the irreparable harm element may be proved by a showing of "likelihood of confusion as to source or sponsorship." *Standard & Poor's, supra,* at 708. Plain-

---

**4.** Clairol asserts (Doran afft. ¶ 3) that the licensing agreement required Clairol to maintain the Klorane trade dress and package quality. No copy of the agreement has been produced. For purposes of this motion I will assume that this uncontradicted allegation is true. It tends to prove that Clairol believed that the packaging of Klorane was valuable enough to give its seller a competitive advantage.

tiffs herein have taken that approach. The irreparable harms they claim they will suffer are those which would arise from the likelihood that consumers will confuse Institute Swiss for Klorane. Indeed, the Second Circuit has held that when there is probability of confusion, irreparable harm is well-nigh inevitable. *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971). Confusion by purchasers would cause Cosmetique and Clairol to lose control of their business reputation and goodwill. Because the products look similar, consumers might attribute any defects in Institute Swiss to Klorane. This loss of control of business reputation due to confusingly similar trade dress would, if proven, constitute irreparable harm for preliminary injunction purposes. *See Standard & Poor's, supra,* at 708; *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893–894 (2d Cir.1982). The loss to plaintiffs of sales of Klorane which would occur because consumers would confuse one product for the other would also constitute irreparable harm if proven, because such loss would be difficult if not impossible to calculate. *See Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 28 & n. 2 (2d Cir. 1978); *Omega, supra,* at 1195; *Ideal Toy Corp. v. Chinese Arts & Crafts, Inc.*, 530 F.Supp. 375, 380–81 (S.D.N.Y.1981).

██ Thus, whether plaintiffs have shown irreparable harm hinges on whether they have shown a likelihood of confusion. Likelihood of confusion, moreover, is the substantive "touchstone" of equitable actions under both § 43(a) of the Lanham Act and New York common law,[5] *Commerce Foods, Inc. v. PLC Commerce Corp.*, 504 F.Supp. 190, 193 (S.D.N.Y.1980), so its ex-

istence *vel non* bears heavily on both the irreparable harm and likelihood of success on the merits prongs of the test for granting a preliminary injunction.

### B. *Likelihood of Confusion.*

In *Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 419, 428 (S.D.N.Y.1980), *approved,* 687 F.2d 563 (2d Cir.1982), Judge Sofaer identified three possible types of confusion that could occur in trademark-type cases. The first is simple product confusion: consumers might purchase a defendant's infringing product thinking it was the plaintiff's. The second is confusion of source or sponsorship. Consumers might believe that the originator had either produced the infringing product or sponsored or approved it. The last is what Judge Sofaer called "subliminal trademark association," defined as "defendant's ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's" protected name, mark or trade dress. *Id.*

██ In trade dress cases, likelihood of confusion is assessed by looking at the visual similarity of the packages viewed as a whole, and not by attention to differences of detail. *Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir.1980); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954–955 (2d Cir.1980); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979). Proof of side-by-side sales is not necessary to show likelihood of confusion, *Paco Rabanne, supra,* at 893; rather, the test is whether a consumer who has seen Klorane would distinguish Institute Swiss from it if he saw Institute Swiss alone. *See Ameri-*

---

**5.** When a plaintiff sues for trade dress infringement under § 43(a) of the Lanham Act, he must first establish the protectibility of his product's trade dress by proving that it is nonfunctional and has acquired secondary meaning. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 (2d Cir.1979). Under New York law, however, no secondary meaning needs to be shown. Once plaintiff shows that its trade dress is distinctive, an injunction may issue upon a showing of likelihood of confusion

alone. *See Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 618 F.2d 950, 953–54 (2d Cir.1980); *Ideal Toy Corp. v. Chinese Arts & Crafts, Inc.*, 530 F.Supp. 375, 379 (S.D.N.Y.1981). Indeed, New York law places upon a second comer the obligation to differentiate his product from that of the senior competitor in order to avoid public confusion. *See Commerce Foods, Inc. v. PLC Commerce Corp.*, 504 F.Supp. 190, 193 (S.D.N.Y. 1980) and cases cited therein.

can Home Prods. Corp. v. Johnson Chemical Co., Inc., 589 F.2d 103, 107 (2d Cir. 1978).

Several factors are relevant in applying this test. As Chief Judge Motley wrote:

In determining whether the second comer's trademark or trade dress has created sufficient likelihood of confusion to warrant a preliminary injunction, courts have considered: 1) the strength of the senior manufacturer's mark; 2) any showing of actual confusion; 3) the competitive proximity of the products; 4) the newcomer's purpose in adopting its mark; 5) the degree of similarity between the two marks; 6) the degree of similarity between the products; and 7) the degree of care likely to be exercised by consumers.

Commerce Foods, supra, at 193 (citations omitted). See Thompson Medical Co., Inc. v. Pfizer, Inc., 753 F.2d 208 at 213–14 (2d Cir.1985); Standard & Poor's, supra, at 708; Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This test is more or less fact-specific, and is applied by evaluating each of the factors, no one of which is determinative. Thompson Medical, supra, at 214; Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 (2d Cir.1983). An examination of the facts of this case in light of the above factors negates plaintiffs' contention that there is a high likelihood that consumers will confuse Institute Swiss with Klorane.

■■■ 1. Strength of Klorane's trade dress. As the Second Circuit has indicated, "the strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1131 (2d Cir.1979). "Strength" in this context refers to conceptual, as distinct from market, strength. See Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 48 (2d Cir.1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The conceptual strength of a trade mark, trade dress or other indicator of origin is analyzed using the four categories described by the Second Circuit.

Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. The lines of demarcation ... are not always bright.

Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir.1976). See also McGregor-Doniger, supra, at 1131; Playboy Enters., 486 F.Supp. at 420.

The features of the Klorane package, while they may individually be arbitrary, together are suggestive. Plaintiff's own proof indicates that they considered the Klorane image "clinical ..., distinguished, serious[,] no-nonsense and very sophisticated," (Marty afft. ¶ 4), with the package being "quiet, upscale, prestig[ious]" (Doran afft. ¶ 3). The Klorane trade dress is not fanciful or arbitrary, particularly in light of the numerous other products using simple clean graphics to convey a "clinical" look. In fact, describing the look as "clinical" denotes that the package's appearance calls to mind a clinic or pharmacy where beneficial scientific products are dispensed. This type of image conjuration is precisely the essence of a suggestive mark. The packaging does no more than hint at its contents.

The trade dress must be considered a weak one for a number of reasons. Its main features are used by a not inconsiderable number of other companies for other products. Clean pale colors, strong horizontal bands, and enclosed depictions of plants are commonly utilized in varying combinations (e.g., DX 15, DX 19, DX 20, DX 21, DX 24, DX 27). The trade dress is not arbitrary or fanciful; the "look" of it conveys a clinical image, and the plant pictures are descriptive of the base of the product and indicative of its natural origin.

In sum, then, the combination of a merely suggestive trade dress and wide use of its elements lead me to find that the Klorane trade dress is a weak mark. See Plus

*Prods., supra,* at 1005. The weakness of the mark, however, does not end the inquiry here, since weak marks are entitled to protection, albeit of a narrower scope than strong marks. While strong marks are protected even against wholly unrelated and noncompeting infringing products, *see, e.g., Dallas Cowboys Cheerleaders, supra; Playboy Enters., supra,* a weak mark will be protected against infringement only by competing products, *see Plus Prods., supra,* at 1006. Since Klorane and Institute Swiss are, or certainly have the potential to be, direct competitors, weakness of the Klorane trade dress is not an absolute bar to protectibility in this case.

■ 2. *Actual confusion.* There has been no showing of actual confusion. However, Institute Swiss has been on the market an extremely short time, and although there is some overlap, the distribution outlets used to date by Minnetonka for Institute Swiss have been different from those used by Clairol for Klorane. Thus, opportunities for actual confusion have been few and far between. In any event, since actual confusion is useful evidence of, but not crucial to, a finding of likelihood of confusion, *see Perfect Fit, supra* (lack of proof of actual confusion is a bar to damages; injunction, however, was granted), its absence in this case is not dispositive in defendant's favor.

■ 3. *Similarity of the marks.* It is clear that Minnetonka utilized a marketing concept for Institute Swiss similar to the one plaintiffs used for Klorane. Defendants admit this in their memorandum of law. The issue, however, is whether Institute Swiss creates an overall visual impression similar enough to Klorane that a consumer familiar with a Klorane package might mistake Institute Swiss for it if he were presented singly with an Institute

Swiss package. *See American Home Prods. v. Johnson Chemical Co.,* 589 F.2d 103, 107 (2d Cir.1978). Thus, I must determine whether the "look" of Institute Swiss is too much like the "look" of Klorane.

The Institute Swiss packages are alleged to infringe some of the Klorane packages, specifically those of the Klorane shampoos and conditioners made from botanical extracts. The plant-based Klorane and all of the Institute Swiss boxes feature pictorial representations of the plants from which the products are derived together with separate pictures of the plant's flower or fruit, with the two pictures enclosed in a rectangle with a pale pastel background. Each has a horizontal band, though Klorane's is solid and near the top of the box and Institute Swiss's is made up of a series of thinner bands of alternating colors and is in the lower portion of its box. The typeface used on the upper portion of each box is similar. Each package is bilingually labelled, in English and French.

■ There are, then, substantial similarities.[6] It has not been proved to me, however, that it is likely that consumers would confuse the two, because there are several obvious differences.

Minnetonka has submitted a list of differences almost three pages long, much of which is irrelevant, since the key to this case is overall impression rather than minute detail. The two products do convey distinct impressions, though, because of certain salient differences. Klorane uses a solid off-white background, while Institute Swiss uses a pale pastel colored background with a graph paper overlay. The Klorane package has the brand name at the top of the box, above the horizontal stripe, while on the Institute Swiss package, the name is enclosed within the alternating horizontal bands in the box's lower section.

**6.** Similarity of details is immaterial here, since it is the product's overall visual appearance as consumers see it that is being evaluated, not the particular details of the packages. *See Harlequin Enters., supra,* at 949 (quoting *Perfect Fit, supra,* at 955). The details are simply not relevant to the issue of similarity of the respective trade dresses. They might be relevant, however, in determining whether there was deliberate copying. Correspondence of detail could imply conscious imitation. As discussed below in Part II.B.4., however, Minnetonka has amply rebutted any such inference.

The Klorane box appears to have a more crowded top and bottom than the Institute Swiss box, on which the boldest features are centered. Further, the Institute Swiss box is considerably larger and conveys a more massive appearance than Klorane, which has a more delicate look.

■ Plaintiffs have offered no proof of similarity other than pictures of the respective boxes.[7] Minnetonka, on the other hand, has submitted expert testimony by affidavit to the effect that a consumer would neither believe that the two lines of product came from a common source (Gillies afft. ¶ 14), nor associate an Institute Swiss package with Klorane (Gillies afft. ¶ 15). Thus, Minnetonka has provided evidence tending to negate each principal type of confusion—confusion of product, confusion of source or sponsorship, and subliminal product association. In light of the substantial differences between the trade dresses of the two lines, I conclude that plaintiffs have not proven their right to a preliminary injunction.

■ 4. *Minnetonka's purpose and intent.* Virtually every case in which intentional copying was found has been decided in plaintiff's favor.[8] *See, e.g. Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981); *Harlequin Enters., supra; Perfect Fit, supra; RJR Foods, supra.* Intentional imitation is probative of both likelihood of confusion and secondary meaning. *See Harlequin Enters., supra,* at 950. Thus, a finding of deliberate copying effectively decides the case in favor of the plaintiff. Cosmetique and Clairol contend that Minnetonka deliberately copied the Klorane package in designing Institute Swiss's trade dress. It has offered no evidence of this, however, other than the asserted similarity of the packages, which I found above to be not as striking as plaintiffs would have it. Quite apart from that, though, Minnetonka has negated any inference of bad faith by providing a detailed history of the Institute Swiss trade dress.

■ According to Minnetonka's proof (Taylor afft. ¶ 28, Hatlestad afft. ¶ 3), the Institute Swiss trade dress traces its roots to a 1982 "mock-up" designed for Minnetonka for a proposed product called "Dr. Gaymont's Kurhaus Herbal Elixir." The Kurhaus line was never marketed, but its package design was reworked and adapted when preparatory work was being done on the Institute Swiss line. The Klorane trade dress was not used as a model or looked to at all in creating the Institute Swiss packaging. In its first form, the Institute Swiss box featured a heavy horizontal stripe at the top, and the background was a solid pale color. This is the trade dress that was featured at the New York Bath and Linen Show in summer 1984 at which a Clairol representative informed the Minnetonka personnel that the package looked a lot like Klorane's.

Between that time and the introduction of Institute Swiss to the market, Minnetonka made several changes in the Institute Swiss boxes. A graph paper background was added and the horizontal stripe at the top was narrowed almost to the vanishing point. The purpose of the changes was to insure an appearance for Institute Swiss

---

7. Some of the pictures of Institute Swiss boxes used by plaintiffs as exhibits actually are not representative of the Institute Swiss package as it appeared on the market. Plaintiffs used Minnetonka's trade show brochure as an exhibit. Between the trade show and Institute Swiss's market debut, Minnetonka made certain changes in the Institute Swiss package in order to insure that it was different from Klorane's. Plaintiffs apparently did not differentiate between the trade show displays (Weigel afft. Ex. 2) and the actual Institute Swiss boxes sold in the marketplace (Weigel afft. Ex. 3).

8. [I]t is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed. Then we feel bound to compel him to exercise his engenuity in quarters farther afield.
*American Chicle Co. v. Topps Chewing Gum, Inc.,* 208 F.2d 560, 563 (2d Cir.1953) (L. Hand, J.).

different from that of Klorane, because Minnetonka felt it wanted to be unique and desired no confusion of its products with others (Taylor afft. ¶¶ 27, 28). Additionally, Minnetonka has offered expert evidence that from a design point of view, there is no reason to think that the Institute Swiss look was copied from Klorane's (Jones afft. ¶ 10).

Thus, Minnetonka has adequately explained the source of its package and has demonstrated its good faith in adopting it. There does not appear to have been any intent by Minnetonka to "cash in" on Klorane's trade dress.[9]

■ 5. *Consumer care and sophistication.* Plaintiffs urge on me the conclusion that purchasers of the goods in question would not pay much attention in choosing the product they take off the shelf, since the products are offered in self-service markets where aisles are crowded, shelves are well-stocked and customers are often harried and preoccupied. They argue that since under such conditions trade dress makes or breaks the product, and since the products are relatively inexpensive, consumers are likely to make hasty purchase decisions based on trade dress recognition alone. It follows from this that consumers might take Institute Swiss off the shelf, intending to take Klorane.

The defects in this argument should be apparent. For one thing, the packages are not as similar as plaintiffs suppose, as set forth above. Particularly in light of other competitive products using the same marketing concept and roughly similar packaging (e.g. DX 21), the proof before me tends to show that those who purchase top-of-the-line premium priced prestige beauty aid products can and do differentiate among packages with a number of common elements.

■ 6. *The remaining factors.* The other factors I must consider are the similarity and competitive proximity of the products. Clearly, the Institute Swiss and Klorane lines provide similar products—shampoos, conditioners and soaps—though certain of the items do not overlap. Just as clearly, the lines are competitively close. Both aim at the premium price beauty care market. Although each company is currently using different groups of retail outlets, there is some overlap. There is also a good possibility that Minnetonka will "bridge the gap" and begin selling Institute Swiss through the same outlets Clairol uses for Klorane. The upscale stores now used by Minnetonka to distribute Institute Swiss appear to be akin to the outlets Cosmetique used when it was distributing Klorane, before Clairol came on the scene. Thus it is possible that Minnetonka will follow the same expansion strategy for Institute Swiss that plaintiffs used for Klorane.

The similarity and competitive proximity of the two products do militate in plaintiffs' favor, but in light of my other findings above I can not preliminarily enjoin Minnetonka's marketing of Institute Swiss in its present package. A likelihood of confusion has not been adequately proved.

C. *The New York Anti-dilution Statute.*

■ Plaintiffs have asserted a claim under New York's "anti-dilution" statute, N.Y.Gen.Bus.L. § 368–d.[10] They argue that their Klorane trade dress is protected by that section, entitling them to a preliminary injunction. For the reasons set forth below, I disagree.

The leading case on § 368–d is *Allied Maint. Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), in which the New York

**9.** Contrast this with *Commerce Foods, Inc. v. PLC Commerce Corp.,* 504 F.Supp. 190 (S.D.N.Y. 1980), in which each design change made by defendant made its product increasingly similar in appearance to plaintiff's. In that case the court held that "cumulative absence of differentiation in the ... dress of the parties" may be evidence of deliberate copying. *Id.* at 196. Here, however, a similar design was innocently arrived at and then changed in order to avoid confusion.

**10.** Text cited *supra,* note 2.

Court of Appeals described the purpose and scope of § 368–d's protection against dilution.

> The evil which the legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an *established distinctive* trade-mark or name.... The harm that section 368–d is designed to prevent is the gradual whittling away of a firm's *distinctive* trade-mark or name....
>
> Although section 368–d does not require a showing of confusion or competition to obtain an injunction, it does require a "likelihood of injury to business reputation or of dilution of the *distinctive quality* of a mark or trade name." (Emphasis added). The statute prohibits any use of a name or mark likely to dilute the *distinctive quality* of a name in use. To merit protection, the plaintiff must possess a *strong* mark—one which has a distinctive quality or has acquired a secondary meaning which is capable of dilution.

42 N.Y.2d at 544–45, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (first, second and fifth emphases added).

The Second Circuit parsed the elements of a § 368–d action in *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625–26 (2d Cir.1983). To obtain an injunction, a § 368–d plaintiff must demonstrate (1) that his mark either (a) is distinctive or (b) has acquired a secondary meaning; (2) that there is a likelihood of dilution, which may be proved using either a "tarnishing" or a "blurring" theory; and (3) predatory intent of the defendant. *See Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1206–09 (E.D.N.Y.1983).

1. *The first element.* Plaintiffs have failed to prove that the Klorane trade dress is either distinctive or endowed with secondary meaning such that the protections of § 368–d would attach.

a. *Distinctiveness.* To call a mark distinctive is to imply that it is the product of arbitrariness or fancy. "Distinctive" means "unique"; it is the opposite of "descriptive" or "generic." *See Allied Maint.*, *supra*, 42 N.Y.2d at 545, 399 N.Y.S.2d 628, 369 N.E.2d 1162; *Loctite Corp. v. National Starch & Chemical Corp.*, 516 F.Supp. 190, 218 (S.D.N.Y.1981). In essence, distinctiveness in the antidilution realm may be evaluated in much the same way as strength of the mark is evaluated in the area of likelihood of confusion. I concluded above that Klorane's trade dress is a weak mark for confusion purposes. That must therefore be at least as true for antidilution purposes, since there are numerous suggestions that only the strongest, most well-established marks are protected by § 368–d against dilution. *See Sally Gee*, *supra*, at 625 and sources cited therein ("Dupont shoes, Buick aspirin, Schlitz varnish, Kodak pianos [and] Bulova gowns."). Klorane can hardly be considered well-established in light of its relatively recent debut on the American scene.

b. *Secondary Meaning.* Plaintiffs have not proven secondary meaning sufficiently to warrant equitable relief. They have cited the advertising expenses and sales for the Klorane line in support of their contention that the Klorane trade dress has secondary meaning. They have also cited authorities to prove that evidence of sales and advertising suffices to establish secondary meaning. Yet in each of those cases—*Harlequin Enters.*, *supra*; *RJR Foods*, *supra*, and *Ideal Toy Corp. v. Plawner Toy Mfg.*, 685 F.2d 78 (3d Cir. 1982)—there was proof beyond mere sales and advertising figures. That proof consisted of a consumer survey, extensive media coverage, evidence of long-standing market position, and/or perceptions within the industry. *See also Ideal Toy*, 530 F.Supp. at 379. Here, I have been presented with no proof beyond a cumulative total of $5 million spent by Clairol on advertising since it introduced Klorane and a wholesale sales figure for the most recent year of $6

million for the entire Klorane line.[11] Something more is required.[12] Advertising and sales figures for a tell me little about the degree to which the public associates its trade dress with a certain source. Of course, plaintiffs inform me that *they* consider the Klorane packaging a large factor in Klorane's success, but that is not informative of the public's perceptions.

Furthermore, even if secondary meaning could be established on the basis of sales and advertising alone, the figures plaintiffs have given me do not prove what plaintiffs contend they do. The advertising figure covers amounts spent by Clairol since it introduced Klorane. That means $5 million in at most two and a half years (Clairol began test marketing Klorane in spring of 1982). The sales figure of $6 million is for one year. Assuming sales of Klorane were growing since the product was introduced, the ratio of advertising costs to sales is very substantial. This could indicate an intensive effort to create a secondary meaning which as yet has not borne fruit, or difficulty in establishing recognition. Thus, the evidence provided me does not necessarily prove consumer acceptance and recognition; it is susceptible of other interpretations as well.

2. *The other elements.* Having found that the Klorane trade dress has neither distinctiveness nor secondary meaning, I need go no further. The Klorane trade dress is not subject to the protections of § 368–d. I must add, though, that plaintiffs have failed to demonstrate the existence of the third element, predatory intent by Minnetonka. *See supra,* Part II.B.4.

D. *New York Arts and Cultural Affairs Law.*

 Article 33 of this recently enacted statute is entitled "Offenses Against Trade-Marks." Section 33.09 makes it a misdemeanor to, inter alia, possess or use false trademarks or labels.[13] Plaintiffs contend that a preliminary injunction should issue in this case because of defendants' alleged violation of § 33.09. They have not, however, pointed me to any authority indicating that the State Legislature intended that section 33.09 may be enforced by private parties in civil actions. Quite apart from considerations of the merits of the case at this preliminary stage, it is impossible for me to enjoin conduct at plaintiffs' behest if they have not proved to me the existence of a private right of action authorizing them to request such an injunction.

## III. CONCLUSION

Plaintiffs' motion for a preliminary injunction is hereby denied. Their failure to prove likelihood of confusion at this stage precludes me from finding irreparable harm or likelihood of success on the merits under either federal trademark or New York unfair competition law. Plaintiffs likewise have failed to prove their case under the New York anti-dilution statute. They have failed as well to show that N.Y. Arts & C.A. L. Art. 33 has any bearing on this case. Accordingly, a preliminary injunction will not issue.

SO ORDERED.

---

**11.** Sales of only the allegedly infringed products would presumably be less.

**12.** For a list of possible types of proof besides sales and advertising, *see Thompson Medical, supra,* at 217.

**13.** The text of this statute is quoted *supra,* note 3.