**MEAD DATA CENTRAL, INC., Plaintiff,**

v.

**TOYOTA MOTOR SALES, U.S.A., INC., and Toyota Motor Corp., Defendants.**

**No. 88 Civ. 2854 (DNE).**

United States District Court, S.D. New York.

Dec. 30, 1988.

Smith & Schnacke, Charles J. Faruki, Sue K. McDonnell, Mary Lynn Readey, Dayton, Ohio, of counsel, Cahill, Gordon & Reindel, Dean Ringel, New York City, of counsel, and Arnold, White & Durkee, Bill Durkee, Houston, Tex., J. Paul Williamson, Arlington, Va., of counsel, for plaintiff Mead Data Cent., Inc.

Kenyon & Kenyon, Arthur D. Gray, Albert J. Breneisen, Edward W. Greason, William T. Boland, Jr., Howard J. Shire, Mark D. Engelmann, New York City, of counsel, for defendants, Toyota Motor Sales, U.S.A., Inc. and Toyota Motor Corp.

## OPINION & ORDER

EDELSTEIN, District Judge:

## INTRODUCTION

Plaintiff, Mead Data Central, Inc. ("Mead"), has filed the instant action seeking injunctive relief against defendants, Toyota Motor Corp. ("TMC") and Toyota Motor Sales U.S.A., Inc. ("TMS") (TMC and TMS collectively, "Toyota"). The complaint alleges one claim for false designation of origin pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and one claim of dilution of a tradename pursuant to New York's antidilution statute, New York General Business Law § 368-d. The parties, pursuant to Fed.R.Civ.P. 65(a)(2), have agreed to a consolidation of a hearing for a preliminary injunction and a trial on the merits. A bench trial was held on November 8 and 11 and December 13–15, 1988. The following constitutes the court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff, Mead, is a Delaware corporation with its principal place of business in Miamisburg, Ohio. Joint Pretrial Order ("PTO"), Agreed Fact No. 1. Mead pro-vides various computer assisted research services, primarily under the rubric LEXIS, which is a registered trademark. PTO, Agreed Facts Nos. 1, 4, 10, and 11. Mead, through its LEXIS service, has played a pivotal role in building the computer assisted legal research ("CALR") industry to its current state of widespread acceptance by the legal community. PTO, Agreed Fact No. 4. Mead's principal competitor in the CALR field is the West Publishing Company, through its WESTLAW service.

Defendant, TMC, is a Japanese corporation with its principal place of business in Japan. Defendant, TMS, is a California corporation with its principal place of business in Torrance, California, and is a wholly-owned subsidiary of TMC. PTO, Agreed Facts Nos. 2 and 3. TMC is a manufacturer of automobiles under the Toyota nameplate, and TMS markets Toyota automobiles in the United States. PTO, Agreed Facts Nos. 18–19.

On August 24, 1987 Toyota announced a new line of luxury automobiles to be offered for sale in the fall of 1989. PTO Agreed Facts Nos. 20, 23; Plaintiff's Exhibit ("Px") 99. Toyota will market this new line of cars to upscale consumers, primarily well-educated, status-conscious individuals with household incomes over $50,000. Testimony of John French, Project Manager for LEXUS Division, T. 343, 1. 25—344, 1. 8; Testimony of Jimmie C. Perkins, Senior Vice–President, TMS, LEXUS Division, T. 459, 1. 19—460, 1. 1. The new luxury cars will be marketed through a new division of TMS called LEXUS. PTO, Agreed Fact No. 23. The automobiles will be sold under the LEXUS name followed by an alphanumeric designation. Perkins Testimony, Tr. 442.

Toyota followed a lengthy process in choosing the LEXUS name. In the Spring of 1986, John French, Project Manager for LEXUS, was charged with the search for a name for Toyota's new car division. French Testimony, Tr. 367; Perkins Testimony, Tr. 445. Mr. French retained the firm of Lippincott & Margulies ("L & M") to assist TMS in the development of a new name. French Testimony, Tr. 369–70; Px

11). L & M presented TMS with a list of 219 names during a meeting at TMS on July 29, 1986. French Testimony, Tr. 377; Perkins Testimony, Tr. 473; Px 15 at T0634–638; Px 43. The TMS employees at that meeting did not like any of the names suggested by L & M. French Testimony, Tr. 378–79, 388.

One of the names on the list was ALEXIS. Px 15 at T0634; Px 43 at T2541. At some point during the July 29, 1986 meeting, Mr. French wrote, on his copy of the L & M list, the word "LEXIS," he derived by dropping the "A" from ALEXIS. Px 43 at T2541. Mr. French claims not to have known, at that time, of the Mead LEXIS service. French Testimony, Tr. 407–09. During that meeting, Mr. French claims to have changed the "I" to a "U" and then suggested LEXUS as a possible name. Testimony of William Plourde, An Attorney for TMS, Tr. 473; Deposition of Patricia Britton, An Attorney for TMS, at 16–17. Mr. French contends he changed the LEXIS to LEXUS because the "u" connoted luxury to him.

Mr. French mentioned the name LEXIS to Mr. Plourde and Ms. Britton, who were at the meeting. Both of the attorneys were aware of the LEXIS service but made no mention of it at that time. The court is not persuaded by Mr. French's contention regarding the change from LEXIS to LEXUS and concludes that the change was probably prompted by Mr. Plourde or Ms. Britton either directly or as a result of their mentioning Mead's LEXIS service to Mr. French.

After additional names were developed by L & M and TMS employees, TMS narrowed the list of names to 24. French Testimony, Tr. 399. TMS then retained the firm of Dunteman & Zollweg to conduct focus group interviews to evaluate consumer reaction to each name. Id.; Px 16 at T0749 et seq. The focus group test yielded six preferred names: CAMBRIDGE, LEXUS, VECTRE, VERONE, CALIBRE, and CHAPARAL. Px 16 at T0757. Dunteman & Zollweg recommended that Cambridge be dropped from the list as too stuffy. Perkins Testimony, Tr. 569.

The five remaining names were then sent to Mr. Plourde for a preliminary in-house trademark search. Plourde Testimony, Tr. 475–477. Although he was aware of the LEXIS service and he discovered Mead's mark in his search, Mr. Plourde concluded that the LEXIS mark was not strong and was unrelated to the automotive industry and, therefore, not an impediment to LEXUS. Id. In reaching his conclusion, Mr. Plourde did not specifically consider the dilution issue. Id., Tr. at 481.

In October 1986, TMS approved the LEXUS name and submitted it, along with the four other finalists, to TMC for approval. Perkins Testimony, Tr. 576; Px 16 at T0734. In January 1987, TMC conducted, through its outside trademark counsel, David Kera, its own trademark search of the five names on the final list. Kera Testimony, Tr. 513; Defendants' Exhibit ("Dx") G2. After Mr. Kera concluded that CHAPARAL and VECTRE were not available, Kera Testimony, Tr. 516–18; Dx H2, TMC requested Mr. Kera to conduct a broader search of LEXUS. Kera Testimony, Tr. 519–20; Dx M2. By telex dated April 3, 1987, Dx N2, and letter dated June 18, 1987, Dx O2, Mr. Kera communicated to TMC that LEXUS was available for use and registration in the United States for cars. Kera Testimony, Tr. 520–21. TMC approved the LEXUS name in June 1987 and a public announcement of the new LEXUS line was made in August 1987. Perkins Testimony 581–82.

The choice of the LEXUS name for Toyota's new division and line of cars sparked the controversy that gives rise to this lawsuit. On October 8, 1987, Mead, through its counsel, Bill Durkee of Arnold, White & Durkee, sent a letter of protest to Shoichiro Toyoda, President of TMC and J. Davis Illingworth, Manager of the LEXUS Division of TMS. The letter informed Toyota that Mead considered the use of LEXUS an infringement on its LEXIS trademark, and it specifically referred to the twenty-three currently enacted state antidilution statutes. After a number of meetings between Mead and Toyota personnel failed to re-

solve the controversy, Mead filed the instant lawsuit on April 22, 1988.

The complaint alleges that Toyota's use of the LEXUS mark will likely dilute the LEXIS mark, under the meaning of New York's antidilution statute, N.Y.Gen. Bus.Law § 368–d. The complaint also alleges that the planned use of the LEXUS mark will cause a likelihood of confusion among consumers creating a false impression of the origin of the goods, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). To remedy these alleged harms to its trademark, Mead seeks to enjoin Toyota from using the name LEXUS. Toyota filed counterclaims seeking a declaratory judgment that its planned use of the LEXUS mark will not violate either the antidilution statute or § 43 of the Lanham Act. Toyota also asserted the affirmative defense that the Lanham Act preempts the New York antidilution statute.

## II. CONCLUSIONS OF LAW

### A. LANHAM ACT CLAIM

■ Mead claims that the proposed use of the LEXUS name by Toyota will mislead and confuse purchasers and consumers and convey a false impression as to the source of the products, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)[1], and New York common law. Section 43(a) proscribes "false designation of origin" as to goods and services and it is the only section of the Lanham Act that protects unregistered marks. *See Centaur Communications, Limited v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir. 1987).

■ A § 43(a) claim requires a plaintiff to establish (1) that its mark is entitled to protection; and (2) a likelihood of confusion among "an appreciable number of ordinary prudent purchasers." *Lever Brothers Co. v. American Bakeries Co.,* 693

F.2d 251, 253 (2d Cir.1982). In this case, there is no dispute that Mead has registered the LEXIS trademark with the Patent and Trademark Office, and that the mark has become incontestable under 15 U.S.C. § 1065. *See* Joint Pretrial Order, Statement of Agreed Facts Nos. 10, 11. Such a mark is entitled to the utmost trademark protection. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir.1986). Moreover, defendants do not seriously dispute that the LEXIS mark is entitled to protection under Section 43 and their argument primarily addresses likelihood of confusion. Thus, the court's inquiry will focus on the likelihood of confusion.

■ The law of this circuit with respect to likelihood of confusion was laid down by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Polaroid* sets forth a balancing test of the following factors: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products, (4) the likelihood that the senior user of the mark will bridge the gap, (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the quality of the junior user's product; and (8) the sophistication of the relevant consumer group. *Id.* at 495.

### 1. *Strength of the Lexis Mark*

■ The strength of a mark is its tendency to identify goods sold as emanating from a particular, even if anonymous, source. *See Banff, Ltd. v. Federated Department Stores,* 841 F.2d 486, 491 (2d Cir.1988); *Centaur, supra,* 830 F.2d at 1225. To facilitate analysis of the strength of a mark—and thus of the level of protection to which it is entitled—courts have generally employed the four categories set forth by Judge Friendly in *Abercrombie &*

---

**1.** § 43(a) provides in pertinent part:
Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.
15 U.S.C. § 1125(a).

*Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976): (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. The level of protection increases from (1) to (4).

■ Toyota contends LEXIS is a descriptive mark derived from the latin root "lex," meaning "law," and the suffix "is," which is the common acronym in the computer industry for "information service." A descriptive mark is one that "conveys an immediate idea of the ingredients, qualities or characteristics" of a product. *Abercrombie, supra*, 537 F.2d at 11 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). LEXIS cannot, in any ordinary and plain way, be seen as describing the characteristics of Mead's CALR service. Even if the court were to accept that "IS" is a common acronym in the computer industry, it is not clear that the average consumer views LEXIS as an acronym for "legal information system." The fact that to make such an association a consumer would have to recognize the prefix from Latin and the "is" suffix from the computer trade makes the association by the consuming public unlikely at best. The court, therefore, rejects this argument that LEXIS is a descriptive term.

Alternatively, Toyota notes that "lexis" is an English word that means "lexicon" or "vocabulary and word-stock" and argues that LEXIS describes Mead's service as the "vocabulary of the law." This argument is even more untenable than the first. To establish that LEXIS is an English word required expert testimony at trial. The two linguistics experts disagreed as to which types of dictionaries listed "lexis" as a word. It is apparent that "lexis" is not a commonly used or readily understood word. Further, the etymology of a word is of limited use in Lanham Act analysis because it is the public's perception that is determinative of a mark's classification. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 74 (2d Cir.1988). Even to someone who is familiar with the word "lexis," it requires a modest leap in logic to understand it as descriptive of the LEXIS service. At a minimum, it "requires imagination, thought and perception to reach the conclusion" that LEXIS is a computerized legal research service. *See Abercrombie, supra*, 537 F.2d at 11 (quoting *Stix, supra*, 295 F.Supp. at 488) (defining a suggestive term). Thus, the court finds that the LEXIS mark is at least suggestive or arbitrary.

"Lex" is a commonly recognized prefix derived from the Latin word for "law." The LEXIS service primarily deals with legal research. With some "imagination, thought and perception," one might discern the attributes of the LEXIS service from its name. Accordingly, the court finds that LEXIS is more appropriately categorized as a suggestive term.

The analysis of a mark's strength does not, however, end with application of the *Abercrombie* categories. The Second Circuit has made clear that "the strength of a mark depends ultimately on its distinctiveness, or its "origin-indicating" quality in the eyes of the purchasing public." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979); *see Hasbro, supra*, 858 F.2d at 74. It is, therefore, appropriate to consider evidence of the mark's capacity to indicate origin *in the marketplace. McGregor–Doniger, supra*, 599 F.2d at 1132; *Centaur, supra*, 830 F.2d at 1226. Dr. Robert A. Peterson, who conducted a survey for the plaintiff Mead, concluded that 76% of lawyers and 26% of accountants readily identified the word LEXIS with attributes of Mead's service. Peterson Prefiled Testimony at 39. This evidence leads to the conclusion that among the primary group of users of the LEXIS service, the LEXIS mark is strong.

Toyota contends, however, that among the general public the LEXIS mark is weak and virtually unknown. The court accepts the testimony of William McCullough, defendants' expert commissioned to survey the recognition of the LEXIS mark among the general public, that at most 2% of the general population recognizes the LEXIS mark as describing Mead's CALR service. Nevertheless, to be protectible, a mark need not be well-known by the general public; rather, it is the *consuming* mar-

ket's recognition of the mark that must be determined. *See Centaur, supra,* 830 F.2d at 1226; *McGregor–Doniger Inc., supra,* 599 F.2d at 1131.

Moreover, in addition to the high recognition among users, both surveys suggest that the LEXIS mark is uniquely associated in the minds of the purchasing public with Mead's CALR service. The Peterson Survey shows that 87% of attorneys and 76% of accountants associated LEXIS either with the attributes of the Mead service or with nothing at all. The McCullough Survey shows that 72% of the general population associates LEXIS either with Mead's service or with nothing at all.

In light of the fact that the LEXIS mark is strongly associated with the Mead CALR service by consumers, and that both consumers and the general public, for the most part, make no other association with LEXIS, the court finds that LEXIS is a very strong mark. *See McGregor–Doniger Inc., supra,* at 1131–32.

**(2)** *Similarity of the Two Marks and* **(3)** *Proximity of the Products*

In everyday spoken English, LEXUS and LEXIS are virtually identical in pronunciation, notwithstanding testimony by Professor David M. Yerkes that different pronunciations are possible, *See* Prefiled Testimony of David M. Yerkes, Professor of English and Comparative Literature at Columbia University, Dx Y7–B at 9–15, and defense counsel's laudable attempts at distinguishing the two terms.[2] Toyota, however, has argued vigorously that the two marks, LEXUS and LEXIS, are different in appearance, connotation, and usage, and therefore, even though they may be pronounced similarly, the marks are distinguishable.

The context in which a mark is presented to the public is an important factor in de-

termining the similarity of the marks because the critical issue is the effect the marks will have on prospective purchasers. *Lever Bros., supra,* 693 F.2d at 257; *McGregor–Doniger, supra,* 599 F.2d at 1134. According to Mr. Perkins, the LEXUS mark will always appear in conjunction with the LEXUS symbol—a round-edged, beveled "L" placed in a beveled oval. Dx Y2 and A3; Perkins Testimony, Tr. 584–85, 616. Moreover, Toyota contends that the LEXUS name and mark will appear in an entirely different context, namely on the nameplate of its automobiles, in advertisements for automobiles, and outside its dealerships. Conversely, the LEXIS mark typically appears on its computer terminals, on its paper, and on LEXIS newsletters. It is also abundantly clear that the media in which LEXIS is advertised and in which LEXUS can be expected to advertise are, for the most part, different.[3] These differences in context and physical appearance tend to reduce the similarity of the marks and, consequently, the likelihood of confusion.

Moreover, the two products at issue, automobiles and computer assisted legal research, are dissimilar. LEXUS is a consumer product, while LEXIS is primarily a commercial product. LEXUS will be sold through independent retail dealerships, while LEXIS is typically sold through its direct sales force. Mead contends that automobile companies, including General Motors, Hyundai, and Mitsubishi, are involved in the computer industry through subsidiaries. Nevertheless, at the moment Toyota is not involved in the computer industry, and has averred that it has no present intent to enter that field. The evidence, therefore, demonstrates that these two products are not similar.

The dissimilarity of the products is relevant in considering the second *Polaroid* factor, similarity of the marks. *See Hasb-*

---

**2.** The most tangible evidence of the aural similarity of the two marks was the need of counsel to spell them out in order to clarify the record at various points throughout the trial.

**3.** The court notes that the media for advertising for LEXUS and LEXIS might overlap to a certain degree. For instance, LEXIS advertises in

the ABA Journal in which automobile manufacturers also advertise. Nonetheless, there are significant differences in that a large portion of the LEXUS advertising is likely to be on television and radio, two media in which LEXIS concededly does not usually advertise.

*ro, supra,* 858 F.2d at 77; *Centaur, supra,* 830 F.2d at 1226. The fact that the two products at issue are not similar, that Toyota and Mead are not competitors, nor are likely to be competitors, and that their respective marks are likely to appear in totally different contexts leads the court to conclude that both the second and third factor militate against a finding of likelihood of confusion.

### (4) *Bridging the Gap*

As noted *supra,* Toyota contends it has no present intention to enter the computer industry in any way, particularly not through its LEXUS division. The court accepts this representation. In any event, it is questionable Toyota will enter the CALR industry, which is highly specialized, as distinguished from computer manufacturing in general, in which Toyota's reputation for technical excellence could serve it well. By Mead's own assertion its principal competitor is West Publishing Co. In fact, within the computerized legal research industry, West would appear to be its only significant competitor. It is, therefore, highly unlikely that Toyota would "bridge the gap" between its market and Mead's market.[4]

### (5) *Actual Confusion*

This element is inapplicable to the instant case. LEXUS has as not yet exhibited its car or advertised it widely. Aside from a few articles in trade journals and the business news media, the LEXUS car has not been publicized at all. Thus the lack of evidence of actual confusion neither helps nor hurts Mead. *See Hasbro, supra,* 858 F.2d at 78.[5]

### (6) *Toyota's Bad Faith*

Toyota contends it chose the name LEXUS in good faith. The name was apparently conceived by John French. The way in which Mr. French claims to have arrived at LEXUS was discussed *supra,* in the court's Findings of Fact. It was the court's finding that Mr. French in fact knew of the LEXIS mark before he changed the name from LEXIS to LEXUS. In any event, even accepting all of Toyota's testimony, two of the six TMS employees present at the July 29, 1986 meeting were aware of the LEXIS service when Mr. French suggested the LEXUS name.

Toyota further contends in support of its good faith that the association of LEXUS with the Mead service was negative in focus group evaluations of various names. Consequently, there was no discernible benefit to copying the LEXIS name and certainly no predatory intent.

Toyota was aware at an early stage in the name-selection process of the LEXIS service. Notwithstanding this awareness, the LEXUS name continued to be considered. Further, as early as October 1987, Toyota was put on notice by Mead that it objected to the use of LEXUS, specifically citing antidilution statutes. Five months of sporadic negotiations ensued, culminating in this lawsuit. Although Toyota may not have intended to trade on the LEXIS mark, it certainly acted in disregard of it. The court therefore, cannot consider Toyota's good faith to support its position. Conversely, however, in the context of likelihood of confusion, Toyota's bad faith cannot be said to militate strongly in favor of likelihood of confusion because there is no

---

4. There was testimony at trial by John French that Toyota's LEXUS division would contemplate a line of consumer products such as watches, pens, clothing, sunglasses, and the like. French Testimony, Tr. 366–67. Such products, although they would bear the LEXUS name would also not compete with the LEXUS service. Moreover, such accessories are common in the luxury automobile industry, such as for example the Porsche line of products, and are intended primarily to promote the image of the automobile as a luxury item. *See* French Testimony, Tr. 366.

5. Mead introduced testimony of individual phone conversations with LEXIS sales personnel in which the LEXIS name was confused with Toyota's new automobile. These instances were few and far between and not especially probative. The court notes that actual confusion could not rationally be expected in light of the fact that the LEXUS promotional campaign will not start until January of 1989.

evidence that the LEXIS name would benefit Toyota.

### (7) *Quality of the LEXUS Product*

Toyota presented much testimony of the anticipated quality of the LEXUS line of automobiles. The Toyota reputation for quality was prominently cited. *See* Perkins Testimony, Tr. 557–58, 600–01, 608. In this vein, testimony indicated that the LEXUS automobile will be manufactured in Toyota factories. Further, it was stated that the LEXUS automobiles will receive 400 more quality tests than the current "top of the line" model, the Toyota Cressida, receives. *Id.,* Tr. 592.

Although the quality of Toyota automobiles is not questioned by this court, and it may not even be questioned by American automobile manufacturers, that is not the end of the inquiry. The LEXUS is an untested and unproven quantity. The quality of automobiles cannot be readily predicted and indeed the final verdict on an automobile's quality is often not rendered until it is time-tested and experienced by consumers. The long road of automotive history is strewn with the demise of cars introduced with much fanfare that have failed to live up to the advance promise. Consequently, the fact that Toyota has thus far avoided such a catastrophic failure in this country is no guarantee that the LEXUS will not be, as they say, a "lemon." Nevertheless, the LEXUS may also be a wonderful car. The court simply cannot predict the quality of this car. This factor thus cannot be said either to support or to undercut Mead's claim.

### (8) *Sophistication of the Buyers*

By all accounts, both the buyers of LEXIS and the target market for the LEXUS automobiles are sophisticated. The LEXIS service is used primarily by attorneys, accountants, and other professionals. The LEXUS line will seek to cater to the status-seeking, well-educated, affluent consumer.

Typically, sophistication of the buyer is a factor that will weigh against a finding of likelihood of confusion. *See Centaur, supra,* 830 F.2d at 1228. Mead, however, contends that in this case sophisticated consumers are more likely to be confused because they tend to be more aware than unsophisticated consumers of the diversification of large corporations. This conclusion, Mead argues, is more compelling in the case of car manufacturers, several of which are already in the computer business. This argument is unpersuasive. If a consumer is sophisticated enough to understand that some car manufacturers are involved in the computer industry, he is likely to be sufficiently sophisticated to realize that not every car manufacturer is in the computer industry. In sum, the court finds no reason not to apply the usual rule that the sophistication of consumers militates against a finding of likelihood of confusion.

### 9. *Conclusion as to Likelihood of Confusion*

The *Polaroid* factors are intended to guide the court through the cumbersome task of determining the confusion that a junior mark is likely to cause in the marketplace. *See Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985). It is not, however, an excuse to proceed in a mechanistic and formulaic fashion in deciding whether equitable relief should be granted. *Id.* at 214. The question of likelihood of confusion is always one that is unique to each set of facts. *See Lever Bros., supra,* 693 F.2d at 253. The court must determine whether, in light of the facts, the use of defendant's mark is likely to cause confusion among the consuming public as to the origin or source of the goods in question. *Id.; Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

In light of the factors discussed *supra,* the court finds no likelihood of confusion. The products are sufficiently different that consumers will be able to differentiate them in the marketplace. The marks themselves will be presented to the public in very different contexts, which will allow consumers to distinguish the products as coming from different sources. Moreover, the consumers of both products are sophis-

ticated individuals who are less likely to be confused.

In sum, the court finds no reason to conclude that a consumer confronted with the LEXUS trade name is likely to believe that Toyota's automobile is in any way connected with Mead. Conversely, a consumer confronted with the LEXIS mark will be unlikely to conclude that Toyota or LEXUS are providing that service.[6]

## B. DILUTION CLAIM

### 1. *Preemption Issue*

■ Defendants have asserted as an affirmative defense to Mead's dilution claim that the Lanham Act preempts state antidilution statutes. Toyota primarily contends that the New York antidilution statute is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Lanham Act, *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), and therefore, must be struck down under the Supremacy Clause. Toyota reasons that one of the main objectives of Congress in enacting the Lanham Act was "to create uniform and definite rights for owners of trademarks used in interstate commerce." Toyota Pretrial Memorandum at 29. According to Toyota, by providing greater rights than the Lanham Act, New York's antidilution statute destroys the uniformity sought by Congress and to that extent should be preempted.

Toyota bases its preemption argument on a number of cases in the Eighth Circuit. In *Comidas Exquisitos, Inc. v. Carlos McGee's Mexican Cafe, Inc.*, 602 F.Supp. 191 (S.D.Iowa), *aff'd sub nom. Comidas Exquisitos Inc. v. O'Malley & McGee's, Inc.*, 775 F.2d 260 (8th Cir.1985), conclusorily stated that "the Lanham Act has preempted state trademark law as applied to interstate commerce." *Id.* at 198. The district court did not analyze the issue. Instead, it relied on two earlier cases, *Sar-*

*gent & Co. v. Welco Feed Mfg. Co.*, 195 F.2d 929, 935 (8th Cir.1952), and *Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 844 (9th Cir.1969). The Ninth Circuit, however, has subsequently described the reasoning of *Mister Donut* as dictum and then rejected it. *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir.1980). The *Golden Door* court concluded that by providing greater protection for trademark holders, the state law furthered the goals of the Lanham Act rather than conflicting with it. *Id.*

In *U.S. Jaycees v. Commodities Magazine Inc.*, 661 F.Supp. 1360 (N.D.Iowa 1987), the district court looked to the legislative history of the Lanham Act and concluded that one of the major goals of the Act was to promote uniformity. *Id.* at 1368. Consequently, because the Iowa antidilution statute provides a different standard for relief than the Lanham Act, the state statute should be preempted. The continuing validity of the Eighth Circuit's preemption law as enunciated in *Sargent* and as reiterated in *Comidas Exquisitos* and *Jaycees* has been questioned. *See Critzas Industries v. Waterway–Creve Couer*, 652 F.Supp. 56, 61 n. 2 (E.D.Mo. 1986). In *Critzas*, the district court recognized that recent cases in other circuits have limited preemption of state trademark law only to the extent that such laws permit behavior outlawed by the Lanham Act. *Id.* The *Critzas* court also noted that the Eighth Circuit has not yet had the opportunity to reevaluate its position since the 1954 *Sargent* decision.

This court declines to follow the reasoning of the Eighth Circuit with respect to preemption of state trademark law. The basic purpose of the Lanham Act is to protect trademark holders and the public. *See* S.Rep. No. 1333, 79th Cong., 2d Sess., reprinted in 1946 U.S.Code Cong.Serv. 1274, 1276; *see also Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir.1975);

---

**6.** The court notes, that if Toyota were involved in the manufacture or sale of computers, computer software, data processing, or computerized databases, this conclusion would likely change. The main reason why there is no likelihood of confusion is that the products in question are different, and Toyota does not now compete with Mead, nor does it intend to compete in the future.

*Golden Door, supra,* 646 F.2d at 352. New York's antidilution statute simply provides greater rights than its federal counterpart. To the extent that the New York statute protects rights not provided for by the federal statute, it does not conflict with the Lanham Act but rather, it complements and supplements it. This court finds persuasive the Third Circuit's analysis of the extent to which the Lanham Act preempts state antidilution statutes, namely, that state law is only preempted to the extent it permits behavior outlawed by the federal law. *See Mariniello, supra,* 511 F.2d at 858.

Accordingly, the court holds that the Lanham Act does not preempt New York's antidilution statute.

### 2. *Dilution Claim*

▮ New York's antidilution statute provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368–d.

The law of trademarks and unfair competition in this country has traditionally been based on the law of fraud and deceit. *See* Handler, *Are the State Antidilution Laws Compatible with the National Protection of Trademarks?,* 75 Trademark Rep. 269, 273–74 (1986); F. Schecter, The Historical Foundations of the Law Relating to Trade-Marks 141–45 (1925). Originally, trademarks identified the tradesman who was the source of a particular product. These marks were protected by the guilds of medieval England. Trademark protection, however, was slow to be recognized by the courts and legislatures principally because trademarks did not become important assets in national commerce until the Indus-

trial Revolution in the latter half of the nineteenth century. Schecter, *supra,* at 130.

The first trademark registration statute was enacted in England in 1875 and in the United States in 1870.[7] The reluctance of lawmakers to treat trademarks as property mirrored the prior English cases that based the common law action for trademark infringement on fraud or deceit. This limited view of the protection of trademarks may have stemmed from the Anglo–Saxon antipathy toward monopolies of any kind, which is evidenced in this country by the expansion of antitrust law throughout most of this century.

Section 368–d, enacted in 1954, was the third antidilution statute in the United States after Illinois and Massachusetts. 1954 Legis.Ann. at 49. The statute was intended to complement federal trademark law and state unfair competition law by protecting marks from "the whittling away of an established trademark's selling power and value." *Id.; see also Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (1977); *Sally Gee, Inc. v. Hogan,* 699 F.2d 621, 624–25 (2d Cir.1983). When the New York antidilution statute was enacted in 1954, it was interpreted in light of the historical evolution of traditional trademark law. Courts typically read into the statute a requirement of confusion, fraud, or deceit before affording protection under the statute. *See Allied Mechanical, supra,* 399 N.Y.S.2d at 631, 369 N.E.2d at 1164 (citing *Cue Publishing Co. v. Colgate–Palmolive Co.,* 45 Misc.2d 161, 256 N.Y.S.2d 239 (Sup.Ct.), *aff'd,* 23 A.D.2d 829, 259 N.Y.S.2d 377 (1st Dep't 1965); *King Research v. Shulton, Inc.,* 324 F.Supp. 631, *aff'd,* 454 F.2d 66 (2d Cir. 1972)).

In 1978, the New York Court of Appeals erased any doubt regarding § 368–d by applying its terms literally. *See Allied Mechanical, supra,* 399 N.Y.S.2d 628, 369 N.E.2d 1162. The current interpretation of Section 368–d is clear that a dilution claim

---

**7.** The statute was declared unconstitutional, *see Trade–Mark Cases,* 100 U.S. (10 Otto) 82, 25 L.Ed.550 (1879), and reenacted in 1881 with the constitutionally infirm provisions excised.

is not based on the traditional theories of fraud, deceit, or confusion. Rather, Section 368–d recognizes that the distinctive quality of a trademark is a property right and the cause of action is more akin to the tort of trespass. Thus, simply put, the antidilution statute focuses on the harm to a mark, even absent any confusion or fraud in the marketplace.

Nevertheless, to preclude the monopolization of common words the antidilution statute only applies to "distinctive" marks. To establish a dilution claim, therefore, a plaintiff must prove: (1) that it possesses a strong and distinctive trademark, and (2) that the mark is likely to be diluted by the defendant's mark. *See Sally Gee, supra,* 699 F.2d at 625. A strong mark may be proved by demonstrating that the mark has a distinctive quality or that it has acquired secondary meaning. A plaintiff need not show competition or confusion.

There is a lack of clarity in what is meant by "distinctive." In the area of trademark law, distinctive means "the capacity of a mark to distinguish a product or service which emanates from one source, from products or services emanating from other sources." Callman, Unfair Competition, Trademarks and Monopolies § 18.01 at 2 (4th Edition, rev. Altman); *see Sally Gee, supra,* 699 F.2d at 625; *McGregor–Doniger, supra,* 599 F.2d at 1131; *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1206 (S.D.N.Y.1983).

Some courts, however, have seized on language in the sparse legislative history of § 368–d, 1954 Legis.Ann. at 49, and have concluded that only the most famous and celebrated of trademarks may be diluted. *See, e.g., P.F. Cosmetique, S.A. v. Minnetonka, Inc.,* 605 F.Supp. 662, 672 (S.D.N.Y.1985); *Lord Jeff Knitting Co., Inc. v. Warnaco, Inc.,* 594 F.Supp. 579, 582 (S.D.N.Y.1984). This court does not view that as a correct interpretation of the antidilution statute. Such a restrictive view of § 368–d would limit its protection only to the largest and most powerful corporations in the country. It would allow larger entities to dilute—one might even say to drown out—the trademarks of smaller entities. Moreover, "distinctiveness" is essentially a synonym for "strength." *See McGregor–Doniger, supra,* 599 F.2d at 1131; Restatement of Torts § 731(f) and Comment e at 602. There is no apparent reason for employing a different definition of "distinctive" in dilution cases. The proper inquiry with respect to distinctiveness is whether the mark can distinguish its product from others and is uniquely associated with the source of that product.

As discussed in connection with the Lanham Act claim, the court finds LEXIS to be a very strong mark among consumers of the service, in the category of "suggestive" terms. As the survey evidence revealed, LEXIS is associated, by a large majority of people, either with the Mead service or with nothing at all. Clearly, the mark distinguishes the LEXIS service from other products and it is uniquely associated by the consuming public with the source of the product.

Moreover, Mead has expended considerable time, effort, and money to promote the LEXIS mark. In 1987, Mead spent $3.8 million in advertising and promotion. This advertising has proven effective, judging by the LEXIS-related revenues, which exceeded $200 million in 1987. These revenues are even more impressive when viewed in light of their growth since 1984, when revenues totalled $400,000. These factors are all relevant in determining the distinctiveness of a mark. *See Estee Lauder, Inc. v. Cinnabar 2000 Haircutters, Inc.,* 218 U.S.P.Q. 191, 192 (S.D.N.Y.1982) ($40 million in sales and $1.5 million in advertising expenditures support finding of "distinctiveness" under § 368–d).

In sum, the LEXIS mark is registered and incontestable pursuant to 15 U.S.C. § 1065. LEXIS is uniquely associated in the minds of the consuming public with the Mead service. The mark is a suggestive mark, entitled to significant protection. Finally, Mead has, with considerable success, expended significant sums in promoting its service under the LEXIS name. The court, therefore, concludes that the LEXIS mark

is "distinctive" under the meaning of § 368–d and can be diluted.

The cases cited by Toyota do not compel a contrary result. *P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F.Supp. 662 (S.D. N.Y.1985) stands for the proposition that "distinctiveness in the antidilution realm may be evaluated in much the same way as strength of the mark is evaluated in the area of likelihood of confusion." *Id.* at 672. In that case, Judge Leisure concluded that the mark in question was not strong because other products used similar trade dress to describe the same attributes. In the instant case, LEXIS is not used by any of Mead's competitors and the mark is strongly associated with the Mead service. Moreover, the *Minnetonka* case dealt with trade dress rather than a trademark. The fact that the packaging was not distinctive or unique was a relevant factor in that case. In this case there is no suggestion that the LEXIS mark is used by others to connote the same qualities. Rather, Toyota contends that the mark is not sufficiently well-known among the general public.

Toyota also relies on *Restaurant Lutece, Inc. v. Houbigant, Inc.*, 593 F.Supp. 588 (D.N.J.1984) and *Lord Jeff Knitting Co. Inc. v. Warnaco, Inc.*, 594 F.Supp. 579 (S.D.N.Y.1984). *Lutece* is a New Jersey case applying New York law and devotes virtually no discussion to the antidilution claim, and provides no analysis of the distinctiveness of the mark beyond its Lanham Act discussion. *Lord Jeff,* also does not analyze the distinctiveness issue, but rather concludes that even *if* the mark were distinctive there was no showing of likelihood of dilution. Moreover, *Lutece* was before the court on a motion for preliminary injunction. *Lord Jeff* came before the court on a motion for summary judgment and the court expressly noted that a trial would be the most efficient vehicle to decide the case, rather than risking delay. *Lord Jeff, supra,* 594 F.Supp. at 583.

Having found that the LEXIS mark is distinctive, the question then is whether the LEXUS mark is likely to dilute Mead's trademark. Dilution, left undefined by the New York legislature and by subsequent New York decisions, *see Sally Gee, supra,* 699 F.2d at 625; *see also* Note, 46 Ford.L.Rev. 1315, 1335 (1978), is a "nebulous" concept. *Gear, Inc. v. L.A. Gear California, Inc.*, 670 F.Supp. 508, 521 (S.D. N.Y.1987). Taken to its extreme, any junior use of a distinctive trademark could dilute the senior mark. Courts, however, have been reluctant to interpret dilution so expansively. The Second Circuit in *Sally Gee, supra,* 699 F.2d at 625 applied Callman's definition of dilution: "Dilution 'threatens two separable but related components of advertising value. Junior uses may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey." Callman, Unfair Competition, Trademarks and Monopolies § 21.10 at 34 (4th Edition, rev'd by Altman). In simple terms, dilution addresses the extent to which a junior mark will impair the advertising value of a senior mark.

Toyota contends that only the most famous and well-known marks are protected from dilution. But the fact that a mark is not so universally known that a vast majority of the general public would instantly recognize it, does not mean that it cannot be diluted. The ultimate question of likelihood of dilution must be considered in light of the strength of the mark and the potential for its dilution. For instance, if a mark is strong in a particular market, it may be diluted by an infringer operating in the same or a related market. *See Dreyfus Fund v. Royal Bank of Canada*, 525 F.Supp. 1108 (S.D.N.Y.1981). But the same mark might not be diluted by an infringing mark in an unrelated market, if the junior mark were unlikely to become widely known to the senior user's consumers.

In the instant case, although LEXIS is strong only within its own market, the LEXUS mark is more than likely to become a widely known mark among the general public. The parties have stipulated that in the first nine months of 1989, Toyota expects to spend between $18 and $23 mil-

lion[8] on media advertising. Awareness of the LEXUS mark is likely to spread far beyond its potential purchasers through television, radio, billboards and other print advertising. As a result, even those consumers who are not interested in or able to purchase the LEXUS automobiles will become aware of the LEXUS mark. In short, the LEXUS mark is itself likely to become the sort of "famous" or "celebrated" mark, which Toyota claims is entitled to protection under § 368–d. The effect will surpass "whittling away"—it will dwarf the LEXIS mark. Such a situation is within the ambit of the antidilution statute as surely as the situation in which a universally recognized mark is whittled away by a small local non-competitor. A hypothetical will perhaps clarify this conclusion. Suppose the telephone surveys conducted in this case were conducted two or three years after the introduction of the LEXUS line of automobiles, with the concomitant blitz of advertising and media attention. The court doubts whether three-quarters of the general population would respond that the word LEXIS or LEXUS brought nothing to mind. Moreover, it is more than likely that, even among Mead customers, the word "lexis" might first bring to mind Toyota's car.

Courts have also considered relevant the bad faith of the junior mark's owner in determining the dilution question. As discussed *supra* in connection with the sixth *Polaroid* factor, Toyota has been aware of the LEXIS mark since the LEXUS name was first suggested. Toyota has further been aware since at least October 1987 of the potential dilutive effect of adopting the LEXUS name. Although this course of conduct does not support a finding of likelihood of confusion, it is relevant to the dilution inquiry.

Toyota may not have intended to use the LEXUS name in order to obtain a free-ride on Mead's reputation. Nevertheless, Toyota contends that LEXUS connotes, among other things, high technology. To that extent at least, LEXUS benefits from the association with LEXIS. Moreover, even though Toyota's behavior falls short of predatory intent, it has consistently refused to acknowledge that its use of LEXUS might harm Mead's LEXIS mark. It has persisted with the preparation to launch the LEXUS line with out any regard for its effect on the LEXIS mark. Certainly, the facts demonstrate that Toyota's conduct in this enterprise should not be viewed as good faith that would militate against a finding of dilution.

Accordingly, the court concludes that the LEXUS mark is likely to dilute Mead's distinctive LEXIS mark. N.Y.Gen. Bus.Law § 368–d.

### 3. *The Remedy*

 Section 368–d provides that injunctive relief is appropriate in cases of dilution. Nevertheless, the court has broad discretion in fashioning a remedy for cases in equity, generally, and trademark cases, specifically. *Charles of the Ritz Group, Ltd. v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1318 (2d Cir.1987). The court should consider the harm to be remedied as well as the balance of the hardships on the parties.

As noted supra, the basic harm that the antidilution statute is intended to remedy is the diminution in the advertising value of a mark by a junior user. The statute is addressed to the weakening of associational links between the name and the product. Clearly, enjoining altogether Toyota's use of the LEXUS mark would be an effective remedy. Simply put, if there is no LEXUS there is no dilution.

Toyota has, however, invested considerable time and money into the LEXUS project. Plans had to be made far in advance to prepare for the Fall 1989 introduction of the line. That is not to say that Toyota has been totally blameless; in fact, it has to a large extent placed itself in the precarious position in which it finds itself. It could have made alternative arrange-

---

**8.** These figures relate solely to the purchase of media time and space. It does not include production costs, or advertising agency fees.

The total cost will range from $40 to $75 million.

ments or adopted a backup plan. Litigation is always a risk, and Toyota has been aware of the prospect of litigation for over one year, and yet, it has apparently made no effort to prepare for the possibility of an adverse determination in this case.

Nevertheless, to completely undo all of the plans and expenditures already incurred would be, if not catastrophic, at least an onerous burden: Franchises have been sold to dealers; advertising has been planned; signs have been created. An entire image has been hinged on this name which took over one year to choose from a list of hundreds. An alternative to a permanent injunction should be provided in light of the tremendous hardship an order of permanent injunction against use of the LEXUS name would impose on Toyota.

An alternative order of relief must address various issues. Toyota will be allowed to continue to use the LEXUS name in connection with its automotive products. Toyota should be restrained from competing directly or indirectly with Mead in the provision of computerized information, computer hardware and computer software for as long as Mead continues to be engaged in such businesses. Toyota should also pay the cost of informing Mead's current LEXIS customers that there is no connection between LEXIS and LEXUS. Toyota's future LEXUS advertising, by any medium, must clearly indicate that it is not connected in any way with Mead or LEXIS. Finally, Toyota must financially compensate Mead on a yearly basis for the diminution in the value of its LEXIS mark as an advertising tool. Such compensation may only be used by Mead to supplement its own advertising expenditures to offset the effect of LEXUS' advertising.

If Toyota elects this alternative relief, it must so notify the court and Mead of its intention within five days of the date of this opinion and order. If notice is timely given, the parties are to attempt to draft a joint order setting forth the details of the foregoing paragraph within ten days of this date. Failing to reach agreement, the parties are to submit their proposals to the court within 10 days of the date of this opinion and order.

The following order of permanent injunction shall remain in effect until an alternative order, if any, is entered:

IT IS HEREBY ORDERED that the defendants, Toyota Motor Sales U.S.A. Inc. and Toyota Motor Corp., their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are permanently enjoined from any and all use, display, advertising, or promotion of the name LEXUS either in connection with a division of defendants' companies or as a name for products or services. Within ten days of the entry of this order, defendants shall serve a copy of it on each of their LEXUS dealers and shall instruct the dealers to comply with it.

IT IS FURTHER ORDERED that if the court and plaintiff are notified within five days of the entry of this order that defendants elect the alternative relief described in the court's opinion, this order shall remain in effect until the date of the alternative order.

SO ORDERED.