The COMIC STRIP, INC., and the Comic Strip, Inc., Plaintiffs,

v.

FOX TELEVISION STATIONS, INC., Defendant.

No. 89 Civ. 1773.

United States District Court, S.D. New York.

April 17, 1989.

Handal & Morofsky, Norwalk, Conn. (Anthony H. Handal, of counsel), for plaintiffs.

Cowan, Liebowitz & Latman, P.C., New York City (Roger L. Zissu, Robert J. Bernstein, of counsel), for defendant.

## OPINION

GOETTEL, District Judge.

This trademark infringement action has been brought by The Comic Strip, Inc., a New York corporation, and The Comic Strip, Inc., a Florida corporation (collectively referred to as "plaintiffs" or "The Comic Strip"), against the Fox Television Stations, Inc. ("Fox"), a California corporation, under the Lanham Act, 15 U.S.C. § 1125(a) and New York statutory [1] and common law. The plaintiffs have operated nightclubs featuring comedians under the name "The Comic Strip" in New York and Florida since 1976 and 1979 respectively. "The Comic Strip" is not a registered trademark. The defendant is a television network maintaining television stations across the country. In 1988, Fox allegedly began broadcasting a television show providing comedy entertainment services under the title "L.A. Comic Strip" that was broadcast on a local Los Angeles, California television station. The show was later expanded to New York, Los Angeles, Chicago, Dallas, Washington, D.C. and Houston and renamed "Comic Strip Live." The plaintiffs assert that the defendant's use of the terms "Comic Strip" will mislead viewers and convey a false impression as to the source of the program in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and New York statutory and common law. Accordingly, the plaintiffs seek to preliminarily enjoin Fox's use of the "Comic Strip" mark in connection with their television program.

The standard for granting preliminary injunctive relief in this circuit is well settled. The plaintiffs must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

## I. LANHAM ACT

■ An unregistered trademark is protected under the Lanham Act from "false designation of origin" if the plaintiff can demonstrate that (1) the mark has acquired secondary meaning and (2) there is a likelihood of confusion as to the source of the program. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987).

### A. Secondary Meaning

A mark acquires secondary meaning when "'the primary significance of the term in the minds of the consuming public is not the product but the producer.'" *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 133 (S.D.N.Y.1972)). In determining whether a mark has achieved secondary meaning, the court may examine the following factors: (1) advertising expenditures; (2) consumer studies linking the mark to the source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the plaintiff's mark. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1222 (2d Cir.1987). Although the plaintiffs have submitted no consumer studies or records of sales success, the remaining factors indicate that the plaintiffs are likely to be able to prove at trial that the "Comic Strip" mark has acquired secondary meaning. Annexed to the plaintiffs' complaint are numerous accounts of purportedly unsolicited media coverage of events occurring at the plaintiffs' clubs. Included among the media accounts are such national publications as the New York Times, the Wall Street Journal, Mademoiselle Magazine and Newsweek Magazine. The plaintiffs have also appeared on national television with the "Comic Strip" mark attending the telecast of shows of various comedians. Moreover, the plaintiffs' clubs have served as a site

---

1. The plaintiffs' state law claims are based on N.Y. Gen. Bus. Law § 368–d and N.Y. Gen. Bus. Law § 133.

for the broadcasting of television programs including Good Morning America, The Today Show and Entertainment Tonight. The plaintiffs have also attached copies of some of their advertising, although this advertising appears to be limited to local circulation. The plaintiffs have had the exclusive use of the "Comic Strip" mark for over ten years.[2] Finally, the plaintiffs allege that Fox intentionally copied the "Comic Strip" mark. The plaintiffs have indicated by affidavit that Fox had prior notice of the existence of The Comic Strip comedy clubs. If proven, this allegation would support a finding of secondary meaning.[3] The sum total of this evidence persuades this court that the plaintiffs are likely to succeed in demonstrating that the Comic Strip mark has acquired a secondary meaning in the marketplace. The court's next inquiry must be into the likelihood of confusion.

### B. *Likelihood of Confusion*

The law of this circuit with respect to likelihood of confusion was laid down in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Polaroid* sets forth a balancing test of the following factors: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the senior user of the mark will bridge the gap; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the quality of the junior user's mark; and (8) the sophistication of the relevant consumer group. *Id.* at 495.

### 1. Strength of the Mark

The strength of a mark is "its tendency to identify goods sold as emanating from a particular, even if anonymous source." *Mead Data Central v. Toyota Motor Sales, U.S.A., Inc.,* 702 F.Supp. 1031, 1035 (S.D.N.Y.1988), *rev'd on other grounds,* —— F.2d —— (2d Cir.1989) full text available on WESTLAW, 1989 WL 25279. In *Abercrombie & Fitch Co. v. Hunting*

*World, Inc.,* 537 F.2d 4 (2d Cir.1976), Judge Friendly created a spectrum of trademark protection, dividing marks into four categories ranging from least protective to most: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* at 9. As applied to a serial in the funny pages, the words "comic strip" might be deemed descriptive or even generic. As applied to a nightclub providing live comedy entertainment, however, the terms take on another meaning. "Comic Strip" is not a generic term that refers to a "genus" or "species." *Id.* Nor is it a mark which "describes the qualities or characteristics of a good or service." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). Rather, the "Comic Strip" mark is one which "requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Stix Prods. Inc. v. United Merchants & Mfrs. Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968). We conclude, therefore, that the plaintiffs' mark is at least suggestive and consequently is deserving of protection.

### 2. Similarity of Marks

The pertinent inquiry on this factor is "the general impression conveyed to the purchasing public by the respective marks." *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985). In this case, the plaintiffs' mark, "The Comic Strip," and the defendant's mark, "Comic Strip Live," are virtually identical. The use of the term "live" in connection with the defendant's television program connotes not a different product but a different avenue of television presentation. The likely impression created by the defendant's mark is that it presents a live telecast from the plaintiffs' comedy clubs. We think that the similarity between the two marks creates the very likely possibility of confusion in the marketplace.

---

**2.** The defendant asserts, however, that there is an unaffiliated nightclub in Texas bearing the same name.

**3.** The veracity of the plaintiffs' allegation is not unchallenged. *See infra* p. 980.

### 3. Proximity of the Products

The concern represented by the proximity factor is whether it is likely that consumers will assume either that the junior user's product is associated with the senior user or is a product of the senior user. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1226 (2d Cir.1987). In this instance, both parties provide essentially the same service via different media. The plaintiffs' comedy clubs provide live comedy entertainment in a nightclub setting. The defendant's television program provides comedy entertainment from a nightclub via television. These products are so similar in nature that there is a likelihood that the consuming public would associate the defendant's product with the plaintiffs'. Thus, competitive proximity exists because consumers could mistakenly assume that the "Comic Strip Live" program is a production from "The Comic Strip" nightclub.[4]

### 4. Bridging the Gap

 This factor looks to "whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Id.* at 1227. Trademark law protects the senior user's right to enter a related field in the future. *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976). The plaintiffs assert in their complaint that they are currently in the process of formulating a television program that would provide televised comedy entertainment services of the type currently provided live in plaintiffs' comedy clubs.[5] It is clear, therefore, that the plaintiffs hope to bridge the gap into the television market currently utilized by Fox. This intention, "helps to establish a future likelihood of confusion as to

source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir.1986).[6]

### 5. Actual Confusion

The fifth factor looks to whether any consumers have actually been confused by the two products. The manager of The Comic Strip nightclub located in New York City, Lucien Hold, states in his affidavit that since Fox began airing Comic Strip Live, he has received numerous telephone calls from individuals requesting tickets to the Comic Strip Live television show and indicating their belief that the show was produced by The Comic Strip. He also asserts that he has received telephone calls from individuals asking whether various comedians appearing on the Comic Strip Live would be continuing to perform at the plaintiffs' clubs. These allegations sufficiently persuade the court that there is a likelihood of actual confusion between the two products.

### 6. Junior User's Bad Faith

It is alleged by the plaintiffs that Fox was aware of the plaintiffs' mark prior to broadcasting its television program. In this circuit, proof of actual knowledge can give rise to an inference of bad faith. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1228 (2d Cir.1987). Accordingly, the plaintiffs may be able to demonstrate that Fox acted in bad faith, a factor that will weigh towards issuance of an injunction. It also appears, however, that Fox conducted a title search prior to airing the "L.A. Comic Strip" program. That search did not reveal the existence of the plaintiffs' clubs. As the question of Fox's good or bad faith is as yet unresolved, this factor remains

---

4. The defendant's television program does identify a different club in Los Angeles as its production location.

5. The plaintiffs' original title for their proposed television program included the "Comic Strip" mark. The mark was subsequently omitted from the title, allegedly in response to the defendant's use of the mark in their television program. The current working title of the program is being kept confidential pursuant to a confidentiality agreement between the parties.

6. The defendant has suggested that the plaintiffs only sought entry into the television media to bolster their trademark infringement action. This allegation has not been supported by the facts. Trademark law protects the primary user's right to expand into other media at some time in the future. The proximity in time between the plaintiffs' commencement of this action and their attempted entry into television is not particularly persuasive.

neutral in the balancing of the *Polaroid* factors.

### 7. Quality of Junior User's Product

As evidence of the quality of its product, Fox has submitted a videotape of the television program, as it was aired on March 25, 1989. "The Comic Strip" nightclubs enjoy a strong reputation in the comedy circuit for producing and supporting famous comedians. Indeed, one of today's most celebrated comedians, Eddie Murphy, got his start at The Comic Strip and is managed by one of the owners of The Comic Strip nightclubs. The Fox television stations have relatively recently entered the network television arena, but have rapidly made a name for themselves airing national television programs of various types. We think it likely that the quality of the shows produced by both parties is similar. This factor, therefore, is also neutral.

### 8. Sophistication of the Consumers

As a general rule, sophistication of the consumer is a factor that will weigh against a finding of likelihood of confusion. *Id.* The defendant suggests that the comedy consumer group is small, sophisticated and somewhat elite. Comedy, however, is a form of entertainment that appeals to a wide range of the population. People of all educational and socio-economic backgrounds are likely to be found in both the plaintiffs' and the defendant's audiences. In addition to live and televised comedy programs, a trip to a local video rental store will confirm our conclusion that stand-up comedy is an entertainment form with wide circulation and appeal. We cannot agree that stand-up comedy is limited to the sophisticated viewer. Accordingly, this too is a factor that cuts in favor of neither party.

### 9. Conclusion as to Likelihood of Confusion

As recently stated by Judge Edelstein in *Mead Data Central v. Toyota Motor*

---

*Sales, U.S.A., Ltd.,* 702 F.Supp. 1031 (S.D. N.Y.1988), *rev'd on other grounds,* —— F.2d —— (2d Cir. March 8, 1989) full text available on WESTLAW, 1989 WL 25279:

> The *Polaroid* factors are intended to guide the court through the cumbersome task of determining the confusion that a junior mark is likely to cause in the marketplace. It is not, however, an excuse to proceed in a mechanistic and formulaic fashion in deciding whether equitable relief should be granted. The question of likelihood of confusion is always one that is unique to each set of facts. The court must determine whether, in light of the facts, the use of defendant's mark is likely to cause confusion among the consuming public as to the origin or source of the goods in question.

*Id.* at 1039 (citations omitted). In light of the totality of the factors analyzed *supra* we find that there is a likelihood of confusion between the parties' products. The plaintiffs have adduced evidence indicating that the mark "The Comic Strip" has taken on a secondary meaning in the marketplace. Both parties offer substantially the same form of entertainment in a similar format with only the avenue of expression differing. The name given to the defendant's program is nearly identical to the name of the plaintiffs' clubs thereby creating the possibility that the defendant's programs will be attributed to the plaintiffs. In sum, the products are so comparable that the similarity in the names of the two products creates a serious possibility of confusion among viewers. Thus, we hold that the plaintiffs have demonstrated a likelihood of success on the merits.[7] To justify a preliminary injunction, however, the plaintiffs must demonstrate that they stand to suffer irreparable harm if the preliminary injunction does not issue.

## II. IRREPARABLE HARM

Irreparable harm has been dubbed "'the single most important prerequisite

---

**7.** It should be noted that our finding of likelihood of success on the merits is founded on a strictly legal basis without evidentiary proof. Upon a full trial on the merits, a contrary result could be reached. *See Vitarroz Corp. v. Borden,*

*Inc.,* 644 F.2d 960, 969 (2d Cir.1981) (despite possible likelihood of confusion as to source of goods, balance of equities in favor of junior user justifies denial of injunctive relief).

for the issuance of a preliminary injunction.'" *Bell & Howell: Mamiya Co. v. Masel Supply*, 719 F.2d 42, 45 (2d Cir.1983) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 431 (1973) (footnote omitted)). Preliminary injunctions are issued to forestall imminent and irreversible injury to the plaintiffs' rights. "Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985). Thus, in a trademark case, "[s]ignificant delay in applying for injunctive relief ... tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Id.; accord Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985). In *Citibank*, plaintiffs moved in September 1984 to preliminarily enjoin Citytrust, a Connecticut-based bank, from using the "city" prefix on any office in New York State. The proof adduced for the motion indicated that Citibank had actual notice of Citytrust's planned expansion into New York ten weeks prior to seeking an injunction. Thus, the court determined that "Citibank's failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank*, 756 F.2d at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979)).

In this case, the plaintiffs first learned of the defendant's television program in August 1988 when it was called "L.A. Comic Strip" and aired only in the Los Angeles, California area. The defendant received its first written objection to their use of the "Comic Strip" mark on October 14, 1988 when the plaintiffs' president wrote to the president of the Los Angeles television station protesting the use of the mark. Although letters were exchanged by the parties in November and December 1988, the plaintiffs' action was not commenced until March 15, 1989. At a maximum, this constitutes a seven month delay. Even giving the plaintiffs credit for attempting to reach a settlement without litigation, we are still left with a three month delay since the plaintiffs' last communication with the defendant. The plaintiffs' dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm. *See id.* at 276–77. Moreover, the plaintiffs concede, for the purposes of this motion, that they have not lost revenues as a result of the defendant's alleged infringement. Consequently, the plaintiffs are unable to overcome a significant hurdle on the path to preliminary injunctive relief.[8]

Although we believe that the plaintiffs are likely to succeed on the merits, they do not appear to be in jeopardy of irreparable harm during the pendency of the litigation. Indeed, favorable publicity from television may accrue to their benefit. The defendant, on the other hand, stands to suffer great loss if the preliminary injunction is granted and it is forced to discontinue or alter its existing television programming. Accordingly, the plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

---

**8.** As the irreparable harm requirement applies equally to the plaintiffs' claims under New York state law, our finding of no irreparable harm precludes preliminary relief on those claims as well.